# UNION PACIFIC RAILROAD CO. ET AL. v. UNITED STATES ET AL.

No. 594.   Argued April 9, 10, 1941.—Decided June 2, 1941.

*Mr. Blake A. Williamson* for Kansas City, Kansas, and *Messrs. Henry N. Ess* and *Thomas W. Bockes* for the Union Pacific Railroad Co. *Messrs. Alton H. Skinner, Arthur C. Spencer,* and *Robert F. Maguire* were with them on the brief for appellants.

*Mr. James C. Wilson,* with whom *Solicitor General Biddle, Assistant Attorney General Arnold,* and *Messrs. Richard H. Demuth* and *Burt L. Smelker* were on the brief, for the United States. *Mr. William E. Kemp* for Kansas City, Missouri, and *Mr. Jonathan C. Gibson* for the Atchison, Topeka & Santa Fe Ry. Co. et al.—with whom *Messrs. Hale Houts, Leslie R. Welch, Andrew C. Scott, Roland J. Lehman, John N. Monteith,* and *Christopher B. Garnett* were on the brief for the appellees other than the United States. *Mr. Walter R. McFarland* entered an appearance for the Chicago, Burlington & Quincy Railroad Co.

MR. JUSTICE REED delivered the opinion of the Court.

This appeal involves the legality, under the Elkins Act, of appellants' activities and course of conduct with respect to the new Food Terminal at Kansas City, Kansas. That city and Kansas City, Missouri, are both part

of a district known as Greater Kansas City, which for over three-quarters of a century had been served by a produce market located in Kansas City, Missouri. In 1937 the Union Pacific Railroad, acting upon the suggestion of two promoters, DeOreo and Fean, formulated a plan for the construction of a new market in Kansas City, Kansas. The Union Pacific in turn induced the City of Kansas City, Kansas, to undertake the development of such a market, which the City was to construct, operate and own. Union Pacific became interested in the development in order to increase the volume of its traffic; for, unlike the situation in the Missouri market, it was, with a minor exception, the only railroad with tracks serving the proposed Kansas site. Because business in the Greater Kansas City area was believed insufficient to support a split market, partly in Kansas and partly in Missouri, the plan included taking steps to persuade dealers on the Missouri side to move to Kansas. These negotiations will appear more fully below, but in general they contemplated certain concessions and free rents by the City of Kansas City, Kansas, to those dealers who decided to make the transfer. Ostensibly this was to compensate the dealers for their costs of removal, but actually, at least in some instances, it went somewhat beyond. Throughout the promotion, financing and leasing of the new market facilities, Union Pacific took a leading and dominant part. The market opened for operation on December 4, 1939.

On December 29, 1939, at the request of the Interstate Commerce Commission, the Government filed a bill to enjoin the Union Pacific, the City of Kansas City, Kansas, certain of their officers and agents, and thirty-three produce dealers, from violating the Interstate Commerce Act, 49 U. S. C. § 1 *et seq.*, and the Elkins Act, 49 U. S. C. §§ 41–45, which prohibit rebates, concessions and discriminations in respect to the transportation of property by railroad

in interstate commerce.[1]   Under the provisions of § 3 of the Elkins Act,[2] four other railroads and the City of Kansas

---

[1] Section 1 (1) of the Elkins Act (32 Stat. 847; 34 Stat. 587; 49 U. S. C. § 41 (1)), so far as pertinent here, provides:

"Anything done or omitted to be done by a corporation common carrier, subject to chapter 1 of this title, which, if done or omitted to be done by any director or officer thereof, or any receiver, trustee, lessee, agent, or person acting for or employed by such corporation, would constitute a misdemeanor under said chapter or under sections 41, 42, or 43 of this title, shall also be held to be a misdemeanor committed by such corporation, and upon conviction thereof it shall be subject to like penalties as are prescribed in said chapter or by sections 41, 42, or 43 of this title, with reference to such persons, except as such penalties are herein changed. The willful failure upon the part of any carrier subject to said chapter to file and publish the tariffs or rates and charges as required by said chapter, or strictly to observe such tariffs until changed according to law, shall be a misdemeanor, and upon conviction thereof the corporation offending shall be subject to a fine of not less than $1,000 nor more than $20,000 for each offense; and it shall be unlawful for any person, persons, or corporation to offer, grant, or give, or to solicit, accept, or receive any rebate, concession, or discrimination in respect to the transportation of any property in interstate or foreign commerce by any common carrier subject to said chapter whereby any such property shall by any device whatever be transported at a less rate than that named in the tariffs published and filed by such carrier, as is required by said chapter, or whereby any other advantage is given or discrimination is practiced. Every person or corporation, whether carrier or shipper, who shall, knowingly, offer, grant, or give, or solicit, accept, or receive any such rebates, concession, or discrimination shall be deemed guilty of a misdemeanor, and on conviction thereof shall be punished by a fine of not less than $1,000 nor more than $20,000: *Provided,* That any person, or any officer or director of any corporation subject to the provisions of sections 41, 42, or 43 of this title or of chapter 1 of this title, or any receiver, trustee, lessee, agent, or person acting for or employed by any such corporation, who shall be convicted as aforesaid, shall, in addition to the fine herein provided for, be liable to imprisonment in the penitentiary for a term of not exceeding two years, or both such fine and imprisonment, in the discretion of the court. . . ."

[2] 32 Stat. 848; 36 Stat. 1167; 49 U. S. C. § 43:

"Whenever the Interstate Commerce Commission shall have reason-

City, Missouri, were permitted to intervene as parties plaintiff. The district court issued a temporary restraining order, held hearings, and on April 10, 1940, granted a temporary injunction. After further hearings a permanent injunction was entered on July 13. The appeal comes direct to this Court by virtue of the Expediting Act, 49 U. S. C. § 45, under § 238 (1) of the Judicial Code.[3]

able ground for belief that any common carrier is engaged in the carriage of passengers or freight traffic between given points at less than the published rates on file, or is committing any discriminations forbidden by law, a petition may be presented alleging such facts to the district court of the United States sitting in equity having jurisdiction; and when the act complained of is alleged to have been committed or as being committed in part in more than one judicial district or State, it may be dealt with, inquired of, tried, and determined in either such judicial district or State, whereupon it shall be the duty of the court summarily to inquire into the circumstances, upon such notice and in such manner as the court shall direct and without the formal pleadings and proceedings applicable to ordinary suits in equity, and to make such other persons or corporations parties thereto as the court may deem necessary, and upon being satisfied of the truth of the allegations of said petition said court shall enforce an observance of the published tariffs or direct and require a discontinuance of such discrimination by proper orders, writs, and process, which said orders, writs, and process may be enforceable as well against the parties interested in the traffic as against the carrier, subject to the right of appeal as now provided by law. It shall be the duty of the several district attorneys of the United States, whenever the Attorney General shall direct, either of his own motion or upon the request of the Interstate Commerce Commission, to institute and prosecute such proceedings, and the proceedings provided for by sections 41, 42, or 43 of this title shall not preclude the bringing of suit for the recovery of damages by any party injured, or any other action provided by chapter 1 of this title. . . . *Provided,* That the provisions of sections 44 and 45 of this title shall apply to any case prosecuted under the direction of the Attorney General in the name of the Interstate Commerce Commission."

[3] Cf: *United States* v. *Chicago North Shore R. Co.*, 288 U. S. 1, an appeal from a one-judge court from decree on a petition under § 12 (1) of the Interstate Commerce Act as amended, 49 U. S. C. § 12 (1); *Ethyl Gasoline Corp.* v. *United States*, 309 U. S. 436, 446.

The facts set forth in the findings and opinion of the district court, 32 F. Supp. 917, together with the supporting record references specified by the district judge, give a clear statement of the origin and development of the Kansas City, Kansas, project:

Appellants DeOreo and Fean, before 1937, had promoted various metropolitan terminals with wholesale produce market and rail facilities. In December, 1936, they suggested to Union Pacific the feasibility of such a terminal to be served by its line at Greater Kansas City, and a plan was soon formulated for the construction of facilities on the Public Levee, property of Kansas City, Kansas; Union Pacific's aim was to increase its traffic and revenues from perishable food products. The plan contemplated that ownership of the terminal be vested in the City, which would be eligible for a PWA grant from the United States to cover part of the construction costs. A further consideration was that a city-owned market would be tax-free, and thus able to offer dealers the inducement of especially low rentals. Union Pacific presented engineering and cost estimates to officials of the City of Kansas City, Kansas, who became interested in the project and determined that plans should go forward. Thereafter, Union Pacific and the City participated jointly in the promotion and financing of the terminal; and the court below found after a careful review of the evidence that Union Pacific took "a leading and dominant part." Union Pacific suggested the plan that financing be accomplished by a PWA grant and by revenue bonds of the City, secured only by revenue from the terminal and other levee property. Union Pacific suggested that the City make DeOreo and Fean exclusive leasing agents of the terminal for a period of ten years; when this contract was disapproved by PWA officials, the two promoters were persuaded to consent to its cancellation, and Union Pacific later caused sub-

stantial payments to be made to them by its subsidiary, the Kansas City Industrial Land Company. The City's first application for a PWA grant, which it prepared with Union Pacific's assistance, was denied, but a later application for $1,710,000 won approval in October, 1938. This supplied 45% of the cost of structures the City was to build; the remaining 55% was to be obtained by selling revenue bonds to investment bankers. Union Pacific helped the City secure state legislation authorizing the bonds; the bankers, however, declined to purchase them when Union Pacific refused to guarantee income sufficient to meet fixed charges. Union Pacific then decided to buy the bonds for itself, paying $3,000,000 plus accrued interest; $1,033,000 of this was used to retire outstanding revenue bonds, and the remainder made available for construction of the terminal. The bonds, which were held valid in *State ex rel. Beck* v. *Kansas City*, 149 Kan. 252; 86 P. 2d 476, are secured solely by the revenues accruing from the terminal and other property on the Public Levee; they constitute no claim against the City's general revenues, and the district court found that they "were and are speculative and were not then salable in the ordinary course of the commercial investment business."

Union Pacific also caused its officers, employees and agents, and those of its subsidiary, the Kansas City Industrial Land Company, and its affiliate, the Pacific Fruit Express Company, to render various services related to the promotional, leasing and financing activities; it advanced money for financing preliminary expenses; and together with the City it supervised the actual construction. The terminal as completed consists of railroad facilities, owned by Union Pacific, for which it spent $603,000; and the City's wholesale produce market, with a cold storage plant, produce dealers' buildings, a farmers' market, and some terminal trackage, all constructed with

funds derived from the PWA grant and the revenue bonds sold to Union Pacific.[4] The Food Terminal is a unitary enterprise, with the market and the railroad facilities integral parts of a unified whole. Union Pacific has the only tracks reaching the terminal, except that the Missouri Pacific jointly serves the cold-storage plant.

Active solicitation of the Missouri dealers to move to Kansas began in June, 1937. As early as August, 1937, Union Pacific contemplated the necessity of giving inducements to dealers, either by making direct payments or by buying from them "unwanted properties." In the summer and fall of that year, DeOreo and Fean induced five of the Missouri dealers to serve on a committee for the promotion of the Kansas terminal, agreeing to pay each of them $5000 "in consideration of the services rendered . . . and the occupancy of the food terminal" as tenant. By August, 1938, Union Pacific's employees and agents had negotiated with other dealers with respect to cash payments and other inducements. As opposition developed on the Missouri side, the district court found that the campaign for enlistment of the Missouri dealers became "open and intense." Union Pacific, however, was anxious to avoid violating the Elkins Act, and sought the advice of its legal department, which rendered an opinion that payments made by the City to dealers would be lawful. With the assistance of a committee of prominent citizens, the City was persuaded to undertake such payments; in December, 1939, it passed Resolution 11275 authorizing use of the Public Levee Revenue Fund for settlements either with cash or credits on rental, or both, to cover costs incurred by prospective tenants, "due to rental obligations on present places of business and costs due to abandonment of equipment and facilities

---

[4] The City spent an additional $149,000 from its general revenues for street and sewer improvements in the terminal area.

now located in, and the good will of said established places of business." The legality under state law of such payments by the City was promptly established in a test suit at least partially directed by Union Pacific. *State ex rel. Parker v. Kansas City,* 151 Kan. 1 and 2; 97 P. 2d 104; 98 P. 2d 101.

The City, although now willing to make payments to prospective tenants where necessary, was lacking funds. In arranging for refrigerator service at the market, Union Pacific contracted to buy its entire Kansas City and Omaha ice requirements from the City Ice & Fuel Company. This company leased the market's cold-storage unit for fifteen years at $37,500 per year; Union Pacific now urged the company to pay the City $80,000 as advance rent. The City Ice & Fuel Company did this and also, at Union Pacific's and the City's suggestion, deposited $25,000 with a bank as collateral for proposed unsecured and inadequately secured loans to Missouri produce dealers, although such loans, while offered, were never actually made.

In the negotiations with the Missouri dealers, Union Pacific's representatives took an active part. The district court found that it and the City acted together to induce prospective tenants "by means of offers, agreements, payments, and gifts to such defendant produce dealers and other produce dealers of free rents, reduced rents, free refrigeration, cash payments and rental credits purporting to be for the purpose of paying such produce dealers' cost of removal from Kansas City, Missouri . . . and the value of furniture and fixtures in their Kansas City, Missouri, places of business and the liability on unexpired leases in Kansas City, Missouri, but in some cases in excess of any such costs, values or liabilities." The opinion adds that "The testimony of several dealers with whom negotiations were conducted warrants the conclusion that the primary objective of those

who conducted or took part in the negotiations was not the ascertainment of the loss or expense to the dealer of moving, but was the ascertainment of the amount necessary to be paid to bring about the move."

The record fully supports the trial court's conclusion that the concessions offered were not confined to fair compensation for the costs of removal, as a brief review of the instances specified by the judge will show. Mallin Produce Company, the largest apple concern in the market, claimed $17,300 as its costs of removal, $7,300 for moving its apples, and $10,000 as the "value of existing lease to be abandoned." However, Mallin made no claim that he had any obligations under his Missouri lease; [5] he merely said that he had been assured by his landlord that he could continue the lease as long as he lived, and that he would continue to lease the property "in order to keep a competitor from securing it." Union Pacific's representative nevertheless offered him $15,000 from the City, and then raised the offer to $20,000 when Mallin agreed to take two units instead of one at the terminal. The O. C. Evans Company, which made no statement of the amount of its Missouri investment, was offered $5,000; when it demanded $10,000, the offer was increased to $7,000. The negotiators increased Cherrito's claim from $900 to $1,450 by raising the cost figures for his Missouri fixtures above the amounts he had specified. Garrett-Holmes & Company, which had claimed only about $20,000 in the summer of 1939 without presenting definite figures, in December demanded an adjustment of $35,000, and accepted $30,500 in cash and one year's free refrigeration. Settlement was reached on a claim for unexpired rentals of $15,000 and cost of irremovable business fixtures, $20,000. Litman Produce Company was given $15,000 in

---

[5] Further, Mallin had sublet part of the property, and at the time had a net rental expense of no more than $25 per month.

cash and advance rent after asserting an obligation to pay six years' rent on an unexpired Missouri lease, when in fact the lease was to expire in a few months and merely contained an option to renew for four years; Litman had not exercised the option, though after the injunction he entered into a new lease with his Missouri lessor.   Robinson was allowed to put in a claim for $600 for several unexpired months of an asserted six months' lease, when the tenancy was in fact on a month-to-month basis.   Winnick Brothers, a banana firm, was allowed more than $7,000 as the unamortized cost of fixtures and equipment that had apparently cost them less than a thousand dollars.

The proposed cash payments to dealers totalled $111,-000, and the proposed credits on rent more than $30,000. When negotiations with a dealer resulted in a tentative understanding or agreement, he would be told that Union Pacific could not pay him but that the matter would be submitted to the City.   The district court's injunction intervened before more than one of the adjustments had been formally agreed to by the City Board and none of these payments had actually been made.

In addition to these circumstances, the standard form lease contained express provisions for free rents and reduced rents.   The standard rental adopted was $150 per month per unit, but for the first three months after the official completion date only $50 was charged.   Moreover, the terminal opened for business on December 4, 1939; dealers began moving in then and enjoyed rent-free occupation until February 1, 1940, which was announced as the official completion date.

Union Pacific also made available a certain amount of free advertising by interviewing the terminal's tenants on its radio program and allowing them to describe the kind and quality of their produce.

Throughout all phases of these activities, Union Pacific's principal and compelling motive has been to divert pro-

duce traffic from other railroads to its own. By tariffs filed with the Interstate Commerce Commission, charges for handling are collected by the Union Pacific for cars originating on or destined to other lines. If the market shifts from Missouri to Kansas, it is estimated that Union Pacific stands to gain traffic revenues of several hundred thousand dollars annually from the development of the market, due largely to the fact that a railroad on whose line a shipper is located enjoys a substantial advantage in soliciting competitive traffic, and comparable losses may be reasonably expected by the railroads now serving the Missouri market.

*The Applicable Statutes.* The Elkins Act is a part of the federal statutory system for the regulation of interstate carriers of commerce. As with other portions of that system a chief purpose for its enactment was to eliminate rebates, concessions or discriminations from the handling of commerce, to the end that persons and places might carry on their activities on an equal basis. With the adoption of prohibition against open rate-cutting, various devices were resorted to.[6] The railroads sought control over competitors to escape rate wars and, despite abhorrence of monopolies even in the utility field, strong in the early years of this century, such concentrations of carrier control were thought to have one advantage at least, the reduction of discriminatory practices.[7] Concealment of the receipt or payment of rebates was made manifest. Strengthening of the enforcement provisions was sought. This effort finally culminated in the legislative authorization of the injunction as the simplest and most summary legal instrument to destroy discrimination.[8] The courts have found the statutes effective to accomplish the de-

---

[6] 1897 Annual Report, I. C. C., 47.

[7] 1900 Annual Report, I. C. C., 13.

[8] 1902 Annual Report, I. C. C., 8–10; 32 Stat. 848.

struction of discriminatory practices, whatever their form. Violation of the commerce acts through receipt of advantages is to be tested by actual results, not by intention.[9] Any and all means to accomplish the prohibited end are banned.[10] We recently said that under competitive conditions existing in the New York area the action of the Commission in attacking discrimination by an order against furnishing non-transportation services below cost to the carrier was valid, although there was no showing that the charges were below fair value.[11] Contribution to a shipper's construction cost is forbidden.[12] In fact, favoritism which destroys equality between shippers, however brought about, is not tolerated. Of course, no party to this appeal disputes this broad principle.

Difficulties in statutory construction arise upon further analysis of the statute. Section 1, quoted in note 1, has a provision making it unlawful for any person to give or receive any concession in respect to transportation. A subsequent clause makes the act of giving or receiving a concession a misdemeanor and punishes its violation by "every person or corporation, whether carrier or shipper." Obviously a bonus paid by a railway to induce a prospective shipper to locate along its line would be as much a concession under the statute as a reduction in tariff applicable only to the favored shipper. We are of the opinion that such a payment by a person who is not a carrier, if it is a payment "in respect to transportation," would be equally violative of the section in question.

The first prohibition makes it unlawful "for any person or corporation" to give or receive the concession.

---

[9] *New York, N. H. & H. R. Co.* v. *Interstate Commerce Comm'n,* 200 U. S. 361, 398.

[10] *Armour Packing Co.* v. *United States,* 209 U. S. 56, 72.

[11] *Baltimore & Ohio R. Co.* v. *United States,* 305 U. S. 507, 524.

[12] *United States* v. *Union Stock Yard Co.,* 226 U. S. 286.

The appellants' argument that only carriers or shippers are covered is based on the clause stating the punishment to be applicable whether the alleged violator is "carrier or shipper." Such an argument assumes that the carrier and shipper clause restricts the ordinary meaning of "any person." No reason is advanced for such a restriction. As has been set out, there has been a well-defined and continuous purpose to eliminate preferences to shippers from our system of transportation for reasons of fairness and to avoid rate wars, detrimental to the efficiency of the carriers. The words stressed by appellants as restrictive were added by the Hepburn Act as an amendment to § 1 of the Elkins Act to make clear that the earlier phrase "any person, persons or corporation" included shippers as well as carriers.[13] In our view, action by any person to bring about discriminations in respect to the transportation of property is rendered unlawful by the Elkins Act. Any other conclusion would do violence to a dominant purpose of carrier legislation.

This conclusion is buttressed by other language in the Elkins Act and by decisions in other courts which have dealt with the question. Section 3 authorizes such suits as this against a carrier and such other persons "as the court may deem necessary" when a carrier is "committing any discriminations," and the court may enforce its orders "as well against the parties interested in the traffic" as against the carrier. For example, in *Spencer Kellogg & Sons* v. *United States*, 20 F. 2d 459, a grain elevator owner, without carrier affiliation or cooperation, was convicted for sharing its allowance for elevation service with a shipper.[14]

---

[13] 34 Stat. 584, 588; 40 Cong. Rec. 7022.

[14] See *Interstate Commerce Commission* v. *Reichmann*, 145 F. 235, 240, rebate by non-carrier private car company to shipper, decided prior to the addition of the clause "whether carrier or shipper" by the act of June 29, 1906; *United States* v. *Milwaukee Refrigerator*

The statute specifically requires that the concession given or received shall be "in respect to the transportation of any property in interstate or foreign commerce by any common carrier." As the language of the section covers indisputably the carrier and the freight involved in movement into and out of a metropolitan terminal market,[15] only the phrase "in respect to the transportation" requires analysis. What has been said shows its meaning connotes more than discrimination in payment of tariffs. Offering or soliciting the concessions explicitly violates the section. So does a building bonus granted on condition that the favored industry use the carrier's facilities.[16] The concessions are none the less illegal, if made for non-transportation services,[17] as long as they result in lowering directly or indirectly transportation costs to a shipper. That other inducements may also have influenced the concessions is not important when a materially effective purpose is the securing of traffic for an interstate carrier. Where traffic is an object, and discriminatory advantage the means employed in attempting to obtain or actually obtaining it, there is a violation of the section in respect to transportation.

*Validity of the Plan.* Appellants urge that the City's action in making arrangements for payments to dealers located in the Missouri city was taken solely in furtherance of its municipal interests and without intention to influence traffic and consequently not "in respect to the transportation of property." It is pointed out that it is quite permissible and indeed desirable for a railroad,

---

*Co.*, 145 F. 1007, 1012, likewise decided before the amendment; *Dye* v. *United States*, 262 F. 6; *United States* v. *Koenig Coal Co.*, 270 U. S. 512, 520.

[15] *Southern Pacific Terminal Co.* v. *Interstate Commerce Commission*, 219 U. S. 498.

[16] *United States* v. *Union Stock Yard Co.*, 226 U. S. 286, 308.

[17] *Baltimore & Ohio R. Co.* v. *United States*, 305 U. S. 507.

largely dependent as its prosperity is upon the prosperity of the communities reached by its tracks, to take part in furthering civic development. Certainly there can be no objection on the score of illegality under federal transportation acts for a city, anxious to make its market house profitable, to adopt business practices, normal for real estate operators, if the practices do not involve discriminations "in respect to transportation" by interstate carriers. Thus it is understandable that city and railroad might individually and even coöperatively work hand in hand to promote the city's economic welfare without violating the Elkins Act. But the promotion of civic advancement may not be used as a cloak to screen the granting of discriminatory advantages to shippers. Consequently in the present case the things done are to be appraised by the standards of the statutes, heretofore examined. For this purpose we may lay aside as of small importance the action of the Union Pacific in advancing funds for the expenses of an inspection tour to other cities by the Missouri merchants, who were thus made familiar with markets similar to the proposed market on the Kansas side of the Missouri River. The use of the railroad's radio time to advertise shippers' available stock in trade, while unlawful, seems too minor for further comment in a suit to enjoin discriminations through cash bonuses and free rent. Further, while it would be a violation of the Elkins Act for a carrier to offer a shipper a concession to be paid to the shipper by a non-carrier, we do not find it necessary to rest the decision here upon the carrier's alleged action in offering payments to shippers by the City. For in this case invalidity of the carrier's action would follow *a fortiori* from the invalidity of the City's action. Therefore we examine the City's situation.

Enough has heretofore been stated to support fully the conclusion that some shippers obtained agreements from

the City committee on negotiations for concessions in return for moving into the new market. In determining whether the concessions were in respect to transportation, the coöperative functioning of railway and City, transportation and municipal officers, becomes significant. The phrase "in respect to transportation" has not a technical connotation. It differs from intent or purpose to affect transportation. It is broader than "in reduction of tariffs" though, as appears from the act, it is such a discrimination as results in transportation "at a less rate than that named in the tariffs . . . or whereby any other advantage is given . . ." Our attention is not called to any legislative history as to the purpose of the inclusion of the words in the Elkins Act or as to their meaning. We have found none. We are of the view that the phrase limits the "rebate, concession or discrimination" to advantages or disadvantages in transportation but has no further effect. As the discrimination is limited to transportation matters, normally one would find involved in the discrimination not only a user or prospective user of the facilities of the carrier but also the carrier itself. This is true in this instance. Carrier and City, through a committee of employees of each and through DeOreo and Fean and their aides, worked together to bring into the terminal tenants whose business as found below was "shipping into and out of the Food Terminal products transported in interstate commerce upon which the dealers pay the freight." Where concessions are offered to such dealers by the City in a plan worked out coöperatively by the City and carrier, as here, these concessions are necessarily in respect to transportation. The Union Pacific is charged with the public duty of and is interested in transportation. The promoters brought the scheme for the market first to the railway company. It was impressed with the possibilities and worked earnestly to convince first a few city officials, and then the Board, of the desirability of action

by the City. Money for the preliminary expenses was advanced by the Union Pacific. No objection was made to the use by the City of prepaid rents from the City Ice & Fuel Company to further the removal of the dealers in the manner "conceived and devised," in the words of a finding, by the Union Pacific. The railroad was the "leading and dominant" influence in the entire transaction. If the City was not completely "subservient to the competitive needs" of the carrier, as we said of the warehousing corporations in *Baltimore & Ohio R. Co.* v. *United States,* 305 U. S. 507, 516–17, at least the encouragement and cooperation given by the railroad was of a kind to make it plain that the City's action looked specifically towards gaining traffic for the road. While, as has been stated, it is the result and not the purpose which determines the illegal character of advantages granted shippers, when there is a purpose or plan for securing traffic, developed coöperatively by a carrier and others, the purpose makes clear that the concessions offered are in respect to transportation.

The power of the City to make the concessions and the question of whether any money to be used by the City was contributed directly or indirectly by the Union Pacific do not affect this conclusion. The judgment of the Supreme Court of Kansas in *State ex rel. Parker* v. *Kansas City,*[18] that the City, in its proprietary capacity, under Kansas law has "authority to pay such sums as are necessary . . . to carry out . . . such policies and transactions as may be to the best interest of said city in securing tenants . . . for said Terminal" is not reviewable here. But the opinions in these Kansas cases do not consider or decide whether the proposed payments are a part of a plan to grant advantages to shippers contrary to the Elkins Act. Even if the City's action had

---

[18] 151 Kan. 1 and 2, 8; 97 P. 2d 104, 105; 98 P. 2d 101.

been discussed from that standpoint, the result would not conclude this Court. It is our duty to determine finally the effect of acts or plans plainly under that federal statute.[19] It is impossible, and in our view immaterial, to determine from the evidence and findings whether the Union Pacific contributed indirectly to the fund for making payments to shippers. The railroad owned a three million dollar bond issue which carries a covenant to apply all revenues of the properties involved, after operating expenses, to the bond liquidation. By acquiescing in the application of the revenues to secure tenants, the railway did contribute financially, if there was a failure to earn enough to meet expenses. The estimates as to earnings are necessarily uncertain. From its finding that the projected net return was compensatory, the district court was apparently of the view that the Terminal would pay out.[20]

---

[19] *Houston & Texas Ry. Co.* v. *United States*, 234 U. S. 342, 351; *United States* v. *California*, 297 U. S. 175; *Palmer* v. *Massachusetts*, 308 U. S. 79, 84; *New York* v. *United States*, 257 U. S. 591, 600–01; *United States* v. *Holt Bank*, 270 U. S. 49, 55–56; *Morgan* v. *Commissioner*, 309 U. S. 78, 80–81; *Chicago Board of Trade* v. *Johnson*, 264 U. S. 1, 10; *City of New York* v. *Feiring*, *ante*, p. 283.

[20] The difficulty is shown by the district court's language in finding 34:

"The City's forecast of its ability to pay off the bonds in twenty-two years is based upon a ninety percent occupancy of the market facilities as compared with an actual percentage of occupancy of less than thirty-five percent at the present time, and there is assumed an ability to exact the same level of rentals when the market buildings become twenty-five or thirty years old as at the present time when they are new. The City's estimate of operating expenses is unduly low by reason of the omission of any sums to cover the annual loss due to depreciation and obsolescence not made good by current maintenance.

"The defendant City will derive no immediate direct financial benefit from the operation of the Kansas City Food Terminal. The Union Pacific, by reason of the anticipated improvement of the vol-

*Injunction.* One provision of the permanent injunction entered by the district court enjoined the Union Pacific and Kansas City, Kansas, and their officers or agents from giving cash or rental credits to produce dealers to move into or remain in quarters in the Kansas City Food Terminal.[21] The appellants assign as error the action of the district court in entering any prohibition against payments "in such amounts as its [the City's] governing body may determine" and "against use of its Public Levee revenues" for the payment of "damages sustained by produce dealers moving" to the Terminal.

Resolution 11275 was construed by the Supreme Court of Kansas to authorize disbursements of available market funds for such purposes "as in the judgment of said governing body will be to the best interests of the city." [22] By the resolution these expenditures were limited to the dealers' actual costs of removal, including loss of good will.

In prior sections of this opinion, it has been pointed out that any concession by any person or corporation in respect to transportation is forbidden by the federal transportation statutes. The paragraph of the injunction now

ume of its traffic in perishable produce and consequent increase in its revenues, will receive an immediate and continuing benefit from the project."

[21] This provision reads: "(1) From offering, granting, or giving, or assisting, joining, or co-operating in offering, granting, or giving cash payments or rental credits, free rents, and reduced rents, unsecured or inadequately secured loans constituting concessions, or other valuable considerations to defendant produce dealers or other produce dealers, or produce brokers or other persons, firms, or corporations shipping produce by railroad in interstate commerce to move or for moving to the Kansas City Food Terminal or for leasing space or remaining as tenants in said food terminal."

[22] *State ex rel. Parker* v. *Kansas City,* 151 Kan. 2, 8; 98 P. 2d 101, 105.

under examination undertakes to apply this rule so that no cash payments or rental credits may be given. It is clear that in so far as such cash or credit is a "rebate, concession or discrimination" such an injunction is proper, but do all payments to induce dealers to rent space in the Terminal fall in these classifications? The trial court said,

"The proposed payments to Missouri dealers to induce them to move to the new market not being made to all tenants at the new market and being in the nature of bonuses the amount of which was not based on actual loss or expense, fall within the classification of discriminations prohibited by the Elkins Act."

The words of the injunction, however, go farther and forbid payments even though the payments are in all fairness and strictness limited to actual and necessary expenses and losses in moving an establishment. Consequently, in deciding the form of the injunction, we need to determine the breadth of language necessary "to suppress the unlawful practices" and preclude their revival.[23] The district court summarized in findings of fact and conclusions of law the constant activity of the Union Pacific in pressing forward the idea of the Terminal. It had before it the testimony that the road sought, meticulously, to avoid conflict with the Elkins Act and yet gain the installation of the market; /that the railway representatives acted with the City committees and talked with prospective tenants. Railroad influence pervaded each City action and, in those circumstances, the decree must be molded to meet the danger of subtle moves against the equality between shippers guaranteed by the Elkins Act.

Where, as here, the action of the City in giving cash and rental credits is, as we have decided, a part of a plan in re-

---

[23] *Ethyl Gasoline Corp.* v. *United States,* 309 U. S. 436, 461. Cf. *National Labor Relations Board* v. *Express Publishing Co.,* 312 U. S. 426, 435.

spect to transportation resulting in an advantage to shippers, we conclude that the giving of any cash, rental credit, free or reduced rents, to induce leasing of space in the Terminal is contrary to the Elkins Act. Even if we assume that nothing will be given except the actual costs of removal, the receipt of those costs would put the shipper in a preferred position to all other shippers using the facilities of an interstate carrier who did not receive such concessions. The act condemns any device "whereby any other advantage [than lower tariffs] is given. . . ." The wording of paragraph (1) is approved.

Another prohibition of the injunction determines that the rates for space shall be such "which will yield a proper rate of return upon the full value of the market facilities as a whole, after making provision for all expenses of operation, including maintenance and depreciation." [24] Identical language in paragraph Third (2) of the injunc-

---

[24] The full paragraph enjoins the Union Pacific and the City of Kansas City, Kansas, and their officers and employees,

"(2) From permitting defendant produce dealers or other produce dealers, or produce brokers or other persons, firms, or corporations shipping or receiving traffic by railroad in interstate commerce to occupy or remain as tenants of the wholesale produce buildings or of other facilities at the Kansas City Food Terminal unless said produce dealers, produce brokers, or other persons, firms, or corporations— (a) shall pay rental for past occupancy of such facilities under the provisions of the temporary restraining order and the preliminary injunction heretofore entered in this cause, and (b) shall pay rental hereafter for such facilities at the same rate charged all other shippers occupying similar facilities at said Terminal, which does not amount to a rebate or concession to any tenant, and which will yield a proper rate of return upon the full value of the market facilities as a whole, after making provision for all expenses of operation, including maintenance and depreciation. Provided further that nothing contained in this decree shall be construed to limit the City in the renting of said facilities to a unit basis; but in no event shall the rates of rental and charges prescribed for such facilities aggregate less than is hereinabove provided."

tion forbids produce dealers, of whom many were parties to this proceeding, and their agents from being tenants of the Terminal at rental rates which are not adequate to yield the required amount. The inclusion of this requirement is in our opinion erroneous. The words quoted in the text should be stricken and the injunction amended by inserting in lieu of the stricken words the following: "which is a fair rental value for the facilities occupied." The reasons for the deletion follow.

The preliminary injunction referred to in the excerpt from the final injunction quoted in note 24 set the rentals at not less than certain definite amounts per month and per annum for operating units and office space. There were allowances for uncompleted facilities not now important. No issue is raised here as to whether the sums fixed were or were not a fair rental value. Adequate findings determined the values of the facilities, the estimated gross and net revenues and rates of return. With these findings before it, the district court further found in its final order that the rates fixed in the preliminary injunction were compensatory and did not amount "to a gift of any part of the value of the use of the Food Terminal to the tenant shippers." [25] This result is not

---

[25] These ultimate findings are as follows:

"41. The uniform or standard rates of rental adopted and approved by Kansas City, Kansas, for lease of warehouse space and office space at the Kansas City Food Terminal are $150.00 per month per unit and $1.10 per square foot per annum, respectively, and the average rate of rental adopted or approved by Kansas City, Kansas, for lease of the cold storage plant and appurtenant facilities at said Food Terminal is $38,497 per annum. Such rentals are intended to provide sufficient funds to amortize the principal and pay the interest on the Public Levee Revenue Bonds purchased by the defendant Union Pacific Railroad Company, representing 55 percent of the total cost of construction of the said Food Terminal, and to compensate the City for the use of the facilities for the purpose to which they are dedicated.

questioned. It may therefore be concluded that this scale of charges meets the requirements of the decree for aggregate rates which do not amount to concessions. Since the adequacy of these rates was reached in considering the full value of the properties, including the land furnished by the City and the grant from the Public Works Administration, it may be assumed that they are not less than a fair rental value. The last paragraph of the order provides a method for modification by application to the court should either side be of opinion that this assumption is incorrect. As will immediately appear from this opinion, it is unnecessary to give consideration to the contention that the district court erred in adding the value of the City's land and the amount of the grant to the cost of the facilities. If the correct test is fair rental value, cost of facility is only persuasive, not determinative. Consequently it may be shown as a material factor in determining the fair rental value of the properties but the rates are not required to be upon a level which will give a return upon the value of the investment as a whole.

Fair rental value rather than a compensatory return upon full value of the market facilities is the standard by which the City's schedule of rates is to be judged. To determine fair rental value, the going rates of rental for similar facilities in the community are significant, as are the rentals prospective tenants are willing to pay. Likewise, evi-

"42. The net return, while low as compared to the fair return of many privately owned utilities devoted to the service of the public, is compensatory and, in view of the purpose of the City to bring about industrial improvement and the incidental advantage to the City for that purpose and the return generally obtained from investments in utilities of like or similar nature, the present rental rates and the consequent return to the City are not so low that the use of the Food Terminal by tenants in interstate commerce at those rentals will amount to a gift of any part of the value of the use of the Food Terminal to the tenant shippers."

dence of the over-all cost and the over-all value of the properties would be material. The cost of furnishing the facilities, including the normal return on capital employed in like enterprises would have weight. Other pertinent factors would doubtless emerge in a controversy to have determined judicially whether certain rentals received are or are not fair. When enough evidence is offered to justify a conclusion based upon judgment and not guesswork, the requirements of the judicial process are met.[26]

This is not the case for a rigid rule that aggregate rentals are to equal costs, such as was applied in *Baltimore & Ohio R. Co.* v. *United States,* 305 U. S. 507, 523–524, where this Court approved an order of the Interstate Commerce Commission designed to root out competitive evils in discriminatory warehousing indulged in by carriers in an effort to acquire traffic. The City is entitled to develop its properties and location in accordance with the laws of Kansas for civic advantage, so long as it does not utilize its facilities in furtherance of a scheme to obtain customers for a carrier by the offering of concessions, contrary to the Elkins Act. It was recognized in *Baltimore & Ohio R. Co.* v. *United States* that a charge of fair rental value for services accessorial to transportation would adequately protect even a carrier under proper circumstances. We are of the view that rental charges fixed upon that concept will avoid the discriminatory evils proscribed by the Elkins Act.

With the modifications directed in this opinion, the order of the district court is

*Affirmed.*

MR. JUSTICE MURPHY took no part in the consideration or decision of this case.

---

[26] Cf. *Palmer* v. *Connecticut Ry. & Lighting Co.,* 311 U. S. 544, 559, and cases cited.

MR. JUSTICE ROBERTS:

I cannot agree with the judgment in this case. In last analysis the question presented is whether the Elkins Act proscribes financial transactions by a city with proposed occupants of a city-owned building because those occupants will be shippers in interstate commerce from such building, where the city is to furnish no facilities or services of transportation, where the transactions involve no payments, concessions or discriminations on the part of any interstate carrier, are authorized by state law and are for the city's benefit. A subsidiary question is whether in fact the proposed transactions amount to discriminations in favor of such occupants. A further question is presented with respect to the decree to be entered.

I find it unnecessary to discuss the evidence in detail, or narrowly to examine the findings. I shall endeavor, for the purpose of reaching the legal questions, to consider the case in the light most favorable to the appellees.

The defendants DeOreo and Fean are not philanthropists but promoters who had more or less successfully promoted produce terminals in various cities. They conceived the plan of establishing one in Kansas City, Kansas. They expected a profit out of the venture. Their original idea was that they should become lessees of the terminal and make their profit by sub-renting space in it. When this purpose was abandoned they sought to be made exclusive rental agents. Objection by the P. W. A. rendered this proposal impracticable. They have received considerable payments from Union Pacific for their efforts in connection with the establishment of the terminal.

DeOreo and Fean presented their plan to Union Pacific. That company took an interest, not eleemosynary but practical, in the project. Inasmuch as its tracks would serve the proposed terminal, the railroad naturally desired that the plan go through so that it might get in-

creased business and obtain a competitive advantage over other railroads serving the area known as Greater Kansas City and particularly the food terminal at Kansas City, Missouri. But the railroad did not desire to erect the terminal. It sought to interest the officials of Kansas City, Kansas, in the scheme, and succeeded in doing so.

Some years ago Kansas City, Kansas, had been given a large tract of water-front land which, until recently, had been unused. Through a P. W. A. grant and a loan from Reconstruction Finance Corporation, the city had made some improvements and had erected a grain elevator and docks on the tract which were served by the lines of Union Pacific and Missouri Pacific. The balance of the tract was available for a produce terminal. The establishment of such an instrumentality would obviously be of great benefit to the city in both financial and civic aspects. The plan evolved was that the city should erect such a terminal; that Union Pacific would construct a large team track and switching yard on the ground adjacent to the terminal to be leased by Union Pacific from the city and that the terminal should be financed by the city through a P. W. A. grant and income bonds.

DeOreo and Fean, Union Pacific, and the city officials all struggled earnestly to obtain a grant from P. W. A. An investigation by the Department of Agriculture disclosed that the terminal would be highly beneficial to the producers tributary to the Kansas City market. Investigation by the P. W. A. disclosed that the scheme was desirable and practicable. A grant of not to exceed $1,700,-000 was made, conditioned on the financing of the remainder of the project.

Union Pacific and the city officials negotiated with an underwriting house for the sale, by the city, of $3,000,000 of income bonds, $1,033,000 of which were to be used to pay off the outstanding bonds, and the balance for the erection of the terminal. Although a firm commitment

had been obtained, the bond house, at the last moment, receded from the proposition, thus leaving the whole project in jeopardy. In this situation Union Pacific asserted its willingness to buy the bonds. A bidding was held and Union Pacific was the successful bidder. No question is made of the legality of this investment by the railroad, and its intention to take the bond issue was approved by P. W. A. and was certified to the Interstate Commerce Commission. The city had no power to pledge its property and its general revenues as security for the bonds. It had full authority to issue income bonds, interest, and principal to be paid from the receipts of the terminal.[1]

The condition precedent to the P. W. A. grant having been fulfilled, the city proceeded with the erection of the terminal with the fullest aid and coöperation of Union Pacific. That company had advanced some $22,000 for preliminary expenses, which the city proposed to repay it. Under a ruling of P. W. A. the city could not do so with funds procured for construction, and if the sum is repaid the funds must come out of income. The railroad, not unnaturally, retained an architect to collaborate with the city's architect respecting the construction and exerted every effort to bring the plan to fruition.

In Kansas City, Missouri, there was an existing wholesale produce market. This needed extensive alterations and additions and the expectation was that many of the tenants would move to the new and more convenient terminal in Kansas City, Kansas. All who were interested in the latter realized that tenants of the old one in Missouri might incur expense in giving up their quarters and moving to the new. They realized also that, in order promptly to fill the new building, some concessions in

---

[1] *State ex rel. Beck* v. *Kansas City*, 149 Kan. 252; 86 P. 2d 476.

the amount of early-accruing rentals might have to be made. An ice manufacturing and cold storage plant was part of the project. A tenant was obtained for this unit at a substantial rental. The city authorities negotiated an arrangement with the tenant for payment of some $80,000 in advance rental. With this money, and other advance rents it might obtain, the city felt that it could arrange to reimburse persons who might become tenants for losses incident to their removal. The question arose, however, as to the city's authority so to do. The matter was referred to a committee of lawyers and ultimately to the Attorney General of Kansas. That officer thought the matter should be settled by court decision. Accordingly a proceeding was instituted in the Supreme Court of Kansas and that court held the city had power, in the circumstances, to use advance rents in the manner proposed.[2]

As was expected, tenants of the old market in Missouri, when solicited to move to the new, raised questions of losses due to unexpired leases, abandonment of fixtures, etc. Everybody interested in the new terminal, including DeOreo and Fean, employes of Union Pacific, and representatives of the city, negotiated with these prospective tenants in respect of what would be a fair recompense for their losses due to removal and reestablishment. None of these negotiators had authority to do more than ascertain the claims of such proposed tenants, which were to be submitted to, and adjusted by, a committee representing and acting for Kansas City, Kansas. The evidence is uncontradicted and overwhelming that Union Pacific's employes, and everyone else concerned, made it clear that any adjustment of these losses would have to be made by the city, and by the city only; that the railroad could not, and would not, pay a cent towards any such expense.

---

[2] *State ex rel. Parker* v. *Kansas City*, 151 Kan. 2; 98 P. 2d 101.

When this suit was brought nothing had been paid to any claimant. One claim had been approved by the committee. It turns out that although that claim was supported by affidavit it was in an unjustifiably large amount with respect to the cancellation of an existing lease, but there is no evidence that the city officials, in approving the claim, knew this or would have approved the claim had they known it, and there is no finding that the claim was made in bad faith. Moreover, neither with respect to this claim nor to any other which was under consideration at the time suit was instituted, is there evidence, and there is no finding by the court below or by this court, except by innuendo, that if the claims made were paid any payee would have even been made whole for losses consequent on moving, and establishing himself in the new location, or that he would thereby have had any preference or advantage over other tenants to whom no such payments were made.

At an early day in the development of the project, Union Pacific expressed its willingness to switch all consignments in and out of the terminal to and from other railroads at a uniform and fair charge. It filed a switching tariff with the Interstate Commerce Commission which has been accepted and is concurred in by the other railroads. The tariff is the same as that which has been in force for similar service in Kansas City, Missouri. Thus, all railroads and shippers are to be served indifferently and at a uniform and fair rate for the transportation services involved.

On these facts the question is whether the actions of the railroad, those of the city, or those of the two jointly, constitute a rebate or a discrimination within the meaning of the Elkins Act.[3]

1. It has always been understood that one of the purposes of the interstate commerce law was to prevent a

[3] 49 U. S. C. § 41 (1).

carrier from giving, and a shipper from receiving, transportation services at less than the published tariff rates, and to preclude what is equivalent, namely, the furnishing of a service at tariff rates to one shipper which is withheld from others. The sections of the Elkins Act here relied upon were merely intended to implement this Congressional aim and more efficiently to provide against evasion. Thus it is made unlawful for any person or corporation to offer, to grant, to give, or to solicit, to accept, or to receive, any rebate, concession or discrimination in respect of the transportation of any property in interstate commerce by any common carrier subject to the Interstate Commerce Act, whereby any such property shall by any device whatever be transported at a less rate than the published tariff rate, or whereby any other advantage is given or discrimination is practiced. The language seems too clear to be misunderstood. It is only the carrier, or someone acting in its behalf, who can give or grant a concession. It is only the shipper, or someone acting in his behalf, who can receive or solicit one. The section as originally enacted goes on to provide: "Every person or corporation who shall knowingly offer, grant, or give, or solicit, accept, or receive any such rebate, concession or discrimination" shall be deemed guilty of a misdemeanor and punished by fine. As amended, it imposes a further punishment by fine or imprisonment upon any officer of a corporation or any person "acting for or employed by" any corporation, who is convicted of violating the provisions of the Act. Until the present time no one has supposed that a third party who is neither carrier nor shipper and neither furnishes nor receives transportation service, in making a business deal with a man who happens to be a shipper over an interstate carrier's line, may render himself liable criminally if, and merely because, the result of his transaction will be beneficial when reckoned up in the year's profit and loss statement of the other party to the transaction.

There seems to have been some question, although it is hard to understand why, whether the penal provisions of the Act applied to a shipper or his agents. When the Act was amended by the Hepburn Act the phrase "every person or corporation" was supplemented by an epexegetical clause "whether carrier or shipper." The legislative record shows that the amendment was intended to make sure that shippers who received rebates should be guilty equally with carriers who gave them. It had no other purpose.

Every decision applying the relevant provisions of the Interstate Commerce Act and the Elkins Act has turned upon the fact that someone furnishing a service of transportation covered by a tariff has remitted a part of the tariff charge, or has rendered a free service, or a service below cost to some shippers which others did not enjoy; and where one not a carrier has been held guilty of a violation of the Act it has been because he returned to the shipper, through one performing a part of the transportation service covered by the carrier's tariff, part of the published rate, or has induced the carrier to perform a service for the shipper covered by the tariff at less than the published rate, or has induced the carrier to perform a transportation service for a shipper to which the shipper was not entitled under the published tariff and which, therefore, the carrier failed to perform for others.

The District Court, sensible of this unbroken line of authority, thought it necessary to attribute the proposed payments in some way to Union Pacific. To reach this result, it held that in the terminal enterprise Union Pacific and Kansas City were joint adventurers. Obviously the conclusion is incorrect. Union Pacific was in no sense a partner and did not stand to make a profit from the conduct of the enterprise. It was a lessee of a part of the property for its freight yard at an adequate rental. It

was the owner of bonds lawfully acquired, and, as such, dealt at arm's length with the city. Although the Government seeks to sustain the conclusion of the District Court this court apparently discards it as unjustifiable.

In the second place, the District Court held that Union Pacific and the city were in a conspiracy to grant compensation to prospective tenants. But this is not equivalent to finding that the purpose of the conspiracy was to grant transportation to these tenants at less than the tariff rates of Union Pacific. Inasmuch as it is conceded that there was no purpose to grant any shipper any service not granted to others, or to give any shipper a rebate from the published tariff rates, it seems plain that the latter sort of conspiracy is not made out.

Finally, the District Court sought to spell out a financial contribution by Union Pacific for the benefit of proposed tenants by what it denominated the waiver of the lien of the bonds held by the railroad on the terminal property  An examination of the decision of the Supreme Court of Kansas [4] makes it clear that, under the law of that State, the railroad had no lien, in any proper sense of the term. The state court held that the obligation of the city under the bonds was to devote the net profits of the enterprise to the payment of the principal and interest, but that it was at liberty to pay all necessary operating expenses, including the expenses of obtaining tenants. I do not understand that the opinion of this court approves the finding and conclusion of the District Court in this respect.

The ruling here is much broader, and does not condition violation of the law on any payment or concession by Union Pacific. It is that if the city, which is not a shipper, nor a carrier, and not a furnisher of any transportation service, in dealing with its own property not

---

[4] Note 2, *supra.*

devoted to any service of transportation, sees fit to make an advantageous financial arrangement with a proposed tenant of its property, that transaction, otherwise legal, at once becomes illegal and subjects the city, or its officers, to criminal penalties and to an injunction if it happens that the party with whom it deals becomes, in virtue of the transaction, a shipper over the lines of an interstate carrier, and is benefited by the transaction. The distinction sought to be made between benefits applicable to transportation and benefits generally seems to me illusory. The court expressly holds that intent is immaterial; that if the result is advantageous to the shipper, a rebate, concession, or discrimination from the tariffs of the carrier has been accomplished, within the meaning of the Elkins Act.

I venture to think that no one will be more surprised than the members of the Congress at the attribution of the statutory phrase "every person" who gives or receives, grants or solicits rebates or discriminatory service, to states and municipal corporations and their officers who, in promoting lawful municipal purposes, incidentally bring additional business to an interstate carrier. We know that it is a common practice for chambers of commerce and city authorities to offer to manufacturing and business concerns lands and sites on favorable terms, such as low purchase price, reduced rentals, exemption from taxation for a given period, in an effort to induce such concerns to locate within the limits of a municipality.

We know that, in order to induce men to move their plants from one location to another, it is a practical necessity to offer them some recompense for the expense involved and for the loss which may result from doing business in a new location. Under the decision now announced, citizens or city officials connected with such a transaction, though their purpose be wholly remote from any benefit to a railroad, are guilty of a criminal offense.

We also know that in the competitive effort of railroads to obtain business they have assisted municipalities to establish industries along their lines. It has never been thought that such activity on the part of the railroad, where it gave nothing in money and rebated nothing from its published tariffs in service or rates, constituted a violation of the Elkins Act. To hold that, by this statute, Congress intended to paralyze lawful effort, well within the powers conferred by the states on their municipalities, in the view that such effort constitutes a rebate from a carrier's tariff rate, seems to me to place a forced and unreasonable construction upon the words of the Act.

The opinions of the court below and of this court point out that, as a result of the consummation of the plan for a terminal, Union Pacific expected to carry greatly increased traffic into and out of Kansas City and that this increase necessarily would inflict losses upon its competitors. But the Elkins Act and the Interstate Commerce Act were aimed at specific abuses, and were not general prohibitions of all forms of competition between carriers or limitations on the increase of a carrier's traffic by any sort of competition. In fact, the Congressional policy is to foster and encourage competition between railroads, and to prohibit agreements or conspiracies to suppress it.[5] It is common knowledge that carriers customarily advertise the advantages of sites lying along their lines in the hope of encouraging shippers to locate thereon. It seems to me that the circumstance so pointedly noticed is irrelevant to any question involved in this case. Of course, Union Pacific was actuated by the legitimate desire of increased traffic in all its efforts towards the establishment of the terminal. That avowed motive was, in my judgment, innocent and lawful. Moreover,

---

[5] *United States* v. *Trans-Missouri Freight Association*, 166 U. S. 290, 312, 325.

in truth, this controversy has its roots in the competition of two cities, rather than that of railroads.

2. Assuming, as the opinion does, that the city and its officers were, within the meaning of the Act, persons "acting for" Union Pacific, the proof fails to disclose that the sum proposed to be paid to any produce merchant in connection with his moving to the new terminal was in fact more than fair compensation for loss or was a discrimination against any other tenant. There is no proof, and indeed it would be very difficult to furnish any, that at the end of one, two, or three years of business at the new terminal,—considering the attendant expense of moving and reëstablishing the business at the new location, the incident loss of good will and custom, and the necessity of finding new custom to take the place of that lost,—the balance sheet of any of the tenants would disclose that he was better off than if he had stayed in his old location. And it would be even more difficult to determine that a sum paid him to cover such loss and damage is reflected upon his books in the transportation charges paid by him, rather than in the other items of expense connected with his business. How shall any such allocation be made? None such is necessary where the carrier itself, or someone representing it, grants a concession from the published rate or renders a service not comprehended in its tariff. In such case the fact speaks for itself. In this case the court assumes the fact and, by a blanket and sweeping decree, bans any compensation, however just, to anyone for removing from an old location to the new terminal on the suspicion that the payee may have some advantage over another tenant who did not incur any such expense. Thus the decree will render it impossible for Kansas City to make what it deems legitimate and proper arrangements for the prosecution of a business enterprise in no sense consisting of the service of transportation. It seems clear that Congress never had any such intent in adopting the

Elkins Act. This is to reach into the peculiarly local affairs of the states and to lay the dead hand upon the otherwise lawful activities of states and their subdivisions. Certainly a far more specific mandate should be required to persuade us that Congress had any such purpose.

3. Another feature of the decree seems to me to be equally unjustified. The record discloses that the city adopted a standard form of lease which fixed a uniform rental per unit of space. In order to fill the building promptly, this lease provided that for the first three months the monthly rental should be one-third of the standard monthly rental. Thus a tenant who, after the three months, would pay $150 a unit would get the use of that unit for the first three months for $50. It is again common knowledge that, in a competitive situation, the owner often has to make rental concessions for a brief time at the beginning of the lease term. There is nothing unlawful about this and the decision of the Supreme Court of Kansas sanctions it. The court below swept aside all these arrangements and, although it found "the present rental rates and the consequent return to the City are not so low that the use of the Food Terminal by tenants in interstate commerce at those rentals will amount to a gift of any part of the value of the use of the Food Terminal to the tenant shippers," it nevertheless required that the rentals must be such as to allow a fair return to the city on the total value of the premises including the product of the money granted by P. W. A. and the land acquired by free gift. Under the law, the city was at liberty to turn this land to account in such manner and at such rate of return as it might see fit. While the opinion of the court holds this provision of the decree erroneous, it substitutes what I think an equally improper rule. The city is to be prohibited from leasing its own publicly owned property, in the prosecution of an enterprise which it deems beneficial to the community, at rates it deems proper and rates

which are otherwise within its lawful power. It is told that it must get a fair rental value, and various criteria of fairness are suggested. Thus, the court holds that Congress intended in such a situation to shackle the municipal arm of a sovereign state, for the indefinite future, and compel it to conduct its business contrary to what the law of its own state permits. This result cannot be justified in the guise of preventing an alleged rebate of tariff rates by a carrier, unconnected with and neither controlled by the city nor exerting any legal control over the city, whose only function is that of serving those who use the city's facilities.

I am of opinion that the bill should have been dismissed.

MR. JUSTICE BLACK and MR. JUSTICE DOUGLAS join in this opinion.