**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**FOOD FAIR STORES, INC., Defendant-Appellant.**

**No. 27173**
**Summary Calendar.**

United States Court of Appeals
Fifth Circuit.

Sept. 30, 1969.

Arnold D. Schatzman, Alfred Aronovitz, Aronovitz, Aronovitz & Haverfield, Miami, Fla., for defendant-appellant.

Edward F. Boardman, U. S. Atty., Jacksonville, Fla., Alan S. Rosenthal, Norman G. Knopf, Attys., Dept. of Justice, Washington, D. C., William D. Ruckelshaus, Asst. Atty. Gen., for plaintiff-appellee.

Before GEWIN, GOLDBERG and DYER, Circuit Judges.

GEWIN, Circuit Judge:

The Government brought this civil action pursuant to paragraph 3 of section 1 of the Elkins Act, 49 U.S.C. § 41(3) (1964),[1] in the United States District Court for the Middle District of Florida to recover monetary penalties from appellant Food Fair Stores, Inc., a shipper in interstate commerce.[2] It alleged that Food Fair had knowingly received a valuable consideration in the form of an interest free, purchase-money mortgage loan, as a "rebate" from the Seaboard Air Line Railroad Company. The case was tried without a jury and the district court entered judgment for the Government in the amount of $44,355.27, three times the amount of the concession found to have been received. We affirm.[3]

Food Fair, intending to build a new warehouse facility, began negotiations in 1959 for the purchase of a construction site in the Jacksonville area of Duval County, Florida. These negotiations were conducted with the four railroads serving the area. The district court found that Food Fair sought to use the prospect of increased rail traffic as a bargaining point in these discussions.

On May 18, 1959, Food Fair entered into an agreement with the former Seaboard Air Line Railroad Company to purchase approximately 53.5 acres of land in Duval County at a price of $4,-860 per acre. The initial agreement between the parties required Food Fair to pay $5,000 down, at which time Seaboard would place a deed to the property in escrow pending payment of the full purchase price and the construction of the warehouse. The above agreement was superseded by an Agreement of Sale dated August 6, 1959.[4] The new agreement fixed the amount of land to be conveyed at 52.528 acres, eliminated the escrow arrangement, and provided for delivery of the deed immediately upon receipt of the initial $5,000 payment. The balance of the purchase price was to be evidenced by a promissory note and secured by a purchase money mortgage payable on or before June 1,

---

1. 49 U.S.C. § 41(3) provides in part:
   Any * * * corporation * * * who shall deliver property for interstate transportation to any common carrier * * * who shall knowingly * * * directly or indirectly by or through any means or device whatsoever, receive or accept from such common carrier any sum of money or any other valuable consideration as a rebate or offset against the regular charges for transportation of such property * * * shall * * * forfeit to the United States a sum of money three times the amount of money so received or accepted and three times the value of any other consideration * * *.

2. Both before and after the transactions which gave rise to this case, Food Fair was an interstate shipper over the tracks of the Seaboard as well as those of other railroads serving the Jacksonville area.

3. Pursuant to new Rule 18 of the Rules of this court, we have concluded on the merits that this case is of such character as not to justify oral argument and have directed the clerk to place the case on the Summary Calendar and to notify the parties in writing. See Murphy v. Houma Well Service, 409 F.2d 804, Part I (5th Cir. 1969).

4. The district court found that:
   By the terms of both agreements, the railroad was obliged to make rail service available to the warehouse, with the cost of the extension of track onto the premises to be repaid to the railroad through a charge of five dollars ($5.00) for each loaded car placed on such track until the actual cost of the track was repaid; the railroad was also obliged to provide or arrange for sanitary sewers, sanitary system, water, gas and electricity up to the Sale Tract, "all at no expense to the Buyer."

1961. The deed, mortgage and promissory note all indicated that the purchase price for the land was $255,286.08, that $5,000 was paid initially, and that a balance of $250,286.08 remained unpaid. The sale was consummated on January 12, 1960. A partial release was executed on July 1, 1960, in recognition of a payment which reduced the balance due to $232,279.78. A mortgage satisfaction was executed on April 11, 1961.

The note which represented the balance of the purchase price owed by Food Fair after the initial payment of $5,000, bore no interest, and the district court found that this amounted to a concession received knowingly by Food Fair in violation of the Elkins Act. The parties stipulated to an applicable interest rate of 5%. They also agreed that this rate, applied to the note in question, would yield $14,785.09 in interest for the relevant periods. Thus the court computed the treble forfeiture due the Government to be $44,355.27 and entered judgment for that amount plus interest and costs.

■ There can be no doubt that the Elkins Act prohibits carriers from contributing to the cost of a construction site for a shipper as an inducement for the location of facilities near the carrier's right of way. United States v. General Motors Corporation,[5] see Union Pacific R. Co. v. United States.[6] Likewise, the assumption of the financing costs in the acquisition of such a site is a type of gratuity which the act prohibits. Vandalia R. Co. v. United States.[7] We do not understand Food Fair to dispute either of these propositions, but it does contend that the act is not applicable in the present case.

■ Relying on United States v. General Motors Corporation,[8] Food Fair urges that there can be no violation of the Elkins Act where, as in the present case, the carrier-seller realizes a profit on the sale of land to a shipper. To accept the *General Motors* case as standing for this proposition requires slavish attention to its facts while ignoring its rationale. Though in the particular circumstances of that case the court chose to focus on the price originally paid by the carrier-seller and the price received from the shipper, the dispositive question was whether the carrier had assumed a cost which would otherwise have fallen on the shipper.[9] Considered independently, the rule suggested by appellant has little logical persuasion. It is perfectly possible for a carrier to grant an illegal concession to a shipper in the sale of its land and yet preserve a small profit on the transaction. We do not feel that

---

5. 226 F.2d 745 (3d Cir. 1955).

6. 313 U.S. 450, 61 S.Ct. 1064, 85 L.Ed. 1453 (1941). In *Union Pacific* the court stated:

> Obviously a bonus paid by a railway to induce a prospective shipper to locate along its line would be as much a concession under the statute as a reduction in tariff applicable only to the favored shipper.
>
> \* \* \* \* \*
>
> The concessions are none the less illegal, if made for non-transportation services, as long as they result in lowering directly or indirectly transportation costs to a shipper.

id. at 462, 464, 61 S.Ct. at 1072.

7. 226 F. 713 (7th Cir. 1915).

8. *Supra* at n. 5.

9. In the *General Motors* case, the Baltimore and Ohio Railroad Company undertook to purchase and assemble a tract of land to be used by General Motors as a plant site. In purchasing various parcels of the land, Baltimore encountered "hold-out" sellers, driving the price of the total tract far above fair market value. Because of this difficulty and other obligations undertaken by Baltimore to prepare the tract for General Motor's use, the subsequent sale to General Motors resulted in a $171,329.28 loss to Baltimore. On these facts the Third Circuit rejected the contention that there was no violation of the Elkins Act because General Motors paid fair market value for the tract.

*General Motors* supports a contrary position.

■ Food Fair also challenges the finding of the trial court that Seaboard was not compensated for the delay by Food Fair in paying the balance of the purchase price. It contends that while no interest was expressly provided in the purchase agreement, the sale price exceeded the fair market value of the land and this excess represented compensation for the deferral of payment. Thus Food Fair reasons, it received no concession from Seaboard which would constitute a violation of the act. The dispute on this point is, of course, factual, and was resolved by the trial court against Food Fair. There was ample evidence to support the court's conclusion.

■ In a similar posture, is the allegation that the trial court erred in finding that Food Fair had "knowingly" [10] received the concession from Seaboard. There is not only evidence to support this finding of fact, but evidence which would suggest that Food Fair was soliciting violations of the Elkins Act as a price for their transportation business.[11] Not to belabor the point, neither the finding that Seaboard was not compensated for the deferral of payment by Food Fair, nor the finding that this benefit was "knowingly" received was clearly erroneous. Rule 52(a) Fed.R.Civ.P., 28 U.S.C.A.

The judgment is affirmed.

10. The requirement that the shipper must "knowingly" receive a concession does not mean that the parties must have intended to violate the act. As the *General Motors* court stated, "The crux of the prohibition in the Elkins Act against rebates is the receipt of an 'advantage' by the shipper and the 'receipt of advantages is to be tested by actual results, not by intention.'" 226 F.2d 745, at 748.

11. Mr. Roland P. Jobb, a retired officer of the former Atlantic Coast Line, testified that in discussions with representatives of Food Fair, prior to Food Fair's agreement with Seaboard, it was suggested

that because of the traffic which the new warehouse would generate, Atlantic could afford to sell Food Fair a site at one dollar per acre. He further testified that when he replied that such a sale would violate the Elkins Act, he was told that Atlantic "could well afford to pay the fine in order to get this warehouse." Accepting Food Fair's contention that its Vice President in making these remarks was overcome by lighthearted whimsy, the instance remains illustrative of Food Fair's keen awareness of its economic position and willingness to use this leverage in negotiations with the carriers.