UNITED STATES of America,
Appellant,

v.

GENERAL MOTORS CORPORATION.
No. 11567.

United States Court of Appeals
Third Circuit.

Argued June 8, 1955.

Decided Oct. 14, 1955.

E. Riggs McConnell, Dept. of Justice, Washington, D. C. (Stanley N. Barnes, Asst. Atty. Gen., Leonard G. Hagner, U. S. Atty., Wilmington, Del., James E. Kilday, Sp. Asst. to the Atty. Gen., H. Newton White, Asst. U. S. Atty., on the brief), for the United States.

Aaron Finger, Wilmington, Del. (Henry M. Hogan, W. J. Oldani, Detroit, Mich., E. N. Carpenter, II, Richards, Layton & Finger, Wilmington, Del., on the brief), for appellee.

Before KALODNER, STALEY and HASTIE, Circuit Judges.

KALODNER, Circuit Judge.

This appeal arises out of an action brought by the United States of America against the General Motors Corporation ("GM") under paragraph 3 of section 1 of the Elkins Act, 49 U.S.C.A. § 41(3) which provides that any shipper who "knowingly" receives from a railroad any "valuable consideration" as a "rebate" shall "forfeit to the United States" three times the amount so received.[1] Judgment was entered for GM pursuant to a jury verdict in its favor.

The primary issues to be determined are whether the District Court erred (1) in ruling that certain segments of the alleged concessions were barred by limitations imposed by the Elkins Act and (2) in its instructions to the jury.

The relevant facts are as follows:

In the summer of 1944 GM decided to acquire a plant site in the Philadelphia area. To aid GM in effecting this purpose officials of the Pennsylvania Railroad Company ("Pennsylvania") and the Baltimore and Ohio Railroad Company ("Baltimore") were called to Detroit. It had apparently been decided by GM to allocate $175,000 for the purchase of the site. Pursuant to discussions with these officials Pennsylvania and Baltimore undertook to survey prospective locations for the new plant. Pennsylvania submitted a site near New Castle, Delaware and Baltimore submitted another in what is referred to as Wilsmere, located just outside Wilmington, Delaware. GM authorized each railroad to start securing options on these two sites for its ultimate use as an undisclosed principal.

The Wilsmere site was composed of two tracts totalling approximately 143 acres, one tract called the "Main Plant Site" consisting of about 131 acres, and the other called the "Homestead" tract

1. "(3) Any * * * corporation * * * who shall deliver property for interstate transportation to any common carrier * * * who shall knowingly by employee, agent, officer, or otherwise, directly or indirectly, by or through any means or device whatsoever, receive or accept from such common carrier any sum of money or any other valuable consideration as a rebate or offset against the regular charges for transportation of such property, as fixed by the schedules of rates provided for in said sections, shall in addition to any penalty provided by said sections forfeit to the United States a sum of money three times the amount of money so received or accepted and three times the value of any other consideration so received or accepted, to be ascertained by the trial court; and the Attorney General of the United States is authorized and directed, whenever he has reasonable grounds to believe that any such * * * corporation * * * has knowingly received or accepted from any such common carrier any sum of money or other valuable consideration as a rebate or offset as aforesaid, to institute in any court of the United States of competent jurisdiction, a civil action to collect the said sum or sums so forfeited as aforesaid * * *."

comprising about 12 acres. The Main Plant site consisted of 16 parcels and was used primarily as home lots; the Homestead tract consisted of 70 homesteads. By September 25, 1944, Emmet Hickman, a Wilmington real estate agent engaged by Baltimore had procured options on 12 of the 16 parcels on the Main Plant site for $119,000.

At this time GM expressed dissatisfaction with the pace at which Baltimore was acquiring options on the Wilsmere site. As a result of a conference on September 25, 1944, it was decided that the former arrangement would be abandoned and Baltimore would undertake to assemble the Wilsmere tract and convey it to GM for $150,000. Baltimore agreed also to make available at the site a water main capable of supplying 1,500,000 gallons of water daily. By letter dated October 14, 1944 it made a written offer to convey the Wilsmere tract, less a portion to be retained for yard tracks, for $150,-000. This offer included also the parties' understanding with respect to the water main. GM accepted this offer by letter dated December 1, 1944. The conveyance was to be made 90 days from December 1, 1944.[2]

In August, 1945 Baltimore conveyed 120.5 acres of the Main Plant site to GM for $140,000, retaining the remaining 11 acres for its own use. This tract had been acquired by Baltimore for $171,743.-27. GM retained $10,000 of the $150,000 contract price which sum was to be paid when the Homestead tract was conveyed.

Baltimore experienced difficulty in acquiring the 70 lots comprising this latter tract. Finally, on June 29, 1948, the parties entered a "new agreement" by which 8 of the 12 acres were to be con-veyed for the withheld $10,000. Since Baltimore was unable to convey a good title the agreement provided for indemnity to protect GM and further provided that no substantial structures were to be erected on the land for 20 years. The Homestead tract cost Baltimore $148,-704.01.

The water main was completed in 1945. Full use of the main was initiated by GM in the spring of 1947 when the plant on the Main Plant site was completed. The cost of the main to Baltimore was $36,-338.

Baltimore sustained a $171,329.28 loss as a result of the foregoing transactions.[3] It is the government's contention that GM knew or had ample reason to know the facts as to the price to Baltimore of the conveyed property and the water main. On the basis of these facts it is contended that the amount by which Baltimore's cost exceeded the consideration paid by GM constituted a rebate within the meaning of the Elkins Act. The purpose of the transaction, it is urged, was to induce location of the plant site on Baltimore's line by the giving of a substantial financial concession to GM. Since this "concession" amounted to $171,329.-28 under the triple damages rule, judgment for $513,978.84 was sought.

First as to the statutory limitations issue:

This action was instituted in 1952. Paragraph 3 of the Elkins Act allows the United States to recover for rebates only if they are "received or accepted" during the period of six years prior to the commencement of the action.[4] The Main Plant site was conveyed in 1945, as was the water main. On the basis of these facts the District Court instructed the

2. Despite this contract, for some undisclosed reason GM continued to negotiate with Pennsylvania until May, 1945.

3. Cost of Main Plant site: $171,743.27
   Cost of Homestead tract 148,704.01
   _____
   Total $320,447.28
   From this amount is to be subtracted $35,456, the amount at which the retained acreage of the Wilsmere tract was carried on GM's books. This leaves an amount of $284,991.28. Baltimore receiv-ed $150,000 from GM leaving a net loss on this property of $134,991.28. To this sum must be added the cost of the water main, $36,338, making a total loss of $171,329.-28.

4. " * * * and in the trial of said action all such rebates or other considerations so received or accepted for a period of six years prior to the commencement of the action, may be included therein * * *." 49 U.S.C.A. § 41(3).

jury that with respect to these properties the statute of limitations barred recovery. Accordingly, only the Homestead tract issue was submitted to the jury.

■ There is no indication that three separate conveyances were bargained for and contemplated. Rather the *entire* Wilsmere tract and the water main were considered by the parties as one "package". The transaction being unitary there could be no consummation of the arrangement until the entire agreement was either executed or terminated. The agreement was fully executed as contemplated when Baltimore conveyed the Homestead tract in 1948. It was only at this point of time that it can be said there was a completion of the project initiated in 1944. It follows that the statute of limitations did not begin to run until 1948.

GM contends, in effect, that there was a termination of the 1944 agreement when the parties entered into a *new* contract in 1948 relating to the Homestead tract. We think it clear, however, that in executing this "new" contract the parties were doing nothing more than providing for adjustments made necessary by the unsatisfactory nature of the title obtained by Baltimore. The 1948 agreement was made in pursuance of the project begun in 1944. When GM received the Main Plant site in 1945 it reserved $10,000 from the original sale price of $150,000. This reservation was made in view of Baltimore's obligation to transfer the Homestead tract. When this latter property was conveyed in 1948 the retained consideration of $10,000 was paid and the transaction was at an end. In sum, GM negotiated for a specific tract of land and a water main. This negotiation bore final fruition only when the last necessary conveyance was made.

For the reasons stated we are of the opinion that the District Court erred in ruling that statutory limitations operated to remove from the jury's consideration the Main Plant site and water main phases of the government's action.

Coming now to the issue of the District Court's instruction to the jury:

Denying a request by the government that it instruct the jury that the cost of the property to Baltimore should control the amount of recovery, the District Court instead charged the jury as follows:

"If you find from the evidence defendant (GM) paid the Railroad Company (Baltimore) *a fair and reasonable price* for the land conveyed to it as an industrial site, your verdict should be for the defendant." (Emphasis supplied.)

■ We are of the opinion that this instruction was erroneous.

■ The crux of the prohibition in the Elkins Act against rebates is the receipt of an "advantage" by the shipper and the "receipt of advantages is to be tested by actual results, not by intention." Union Pacific R. Co. v. United States, 1941, 313 U.S. 450, 462, 61 S.Ct. 1064, 1071, 85 L.Ed. 1453. Therein it was noted that "contribution to a shipper's construction cost is forbidden", citing United States v. Union Stock Yard & Transit Co., 1912, 226 U.S. 286, 33 S.Ct. 83, 57 L.Ed. 226.

Assuredly if a contribution to "construction costs" is barred so is a "contribution" to the cost of the shipper's plant site as an inducement for the location of the plant on the railroad's lines.

It is the "contribution" to the shipper and not the "fair and reasonable price" of that which he receives which is critical.

It was of no consequence that the fair market value of the site was less than the price paid by Baltimore; the fact was undisputed that Baltimore paid more than double the amount which GM's real estate experts testified was the site's fair market value. The parties are in agreement that Baltimore encountered "hold-out" sellers in assembling the site. Such an experience is of frequent occurrence when sites are assembled and "procurement" prices are often considerably in excess of "fair value". Recognition of this economic fact of life should have been given by the District Court. There

was no contention here that Baltimore acted recklessly or improvidently in negotiating assembling of the site, or that GM could have, had it conducted the negotiations, acquired the site at "fair value".

It becomes apparent therefore, that if GM desired this property its gain is not to be measured in terms of the property's fair or appraisal value as an industrial site, but in terms of what would have to have been paid for it but for the intervention of Baltimore. The crux of the matter is seen therefore to involve the single question: *has Baltimore absorbed a cost* that would have been incurred by GM in a direct purchase? If the answer is affirmative the *saving* to GM establishes one required element for the existence of a proscribed rebate.

Since the Elkins Act requires that the shipper "knowingly" accept a concession, the critical remaining issue is whether GM had "knowledge" of Baltimore's cost. The government contends that something other than actual subjective knowledge will satisfy the statutory term, although the outer limits of this contention are not made clear. The District Court made subjective knowledge alone an essential ingredient for the government's case.

█ There is no authority for the proposition that mere constructive knowledge is sufficient to satisfy the statute. Nor do we think that in a forfeiture proceeding such a rule of law was intended by Congress. *But* we do agree with the view expressed in United States v. Erie R. Co., D.C.N.J.1915, 222 F. 444, 448, that one may not wilfully and intentionally remain ignorant. This does not mean that negligence is sufficient to charge one with knowledge. "Reasonableness" of inquiry is not the proper test. Only a finding of a *conscious purpose* to avoid enlightenment will justify charging the defendant with knowledge.

Since a corporation was involved it became absolutely essential to instruct the jury as to the imputation of an agent's knowledge to his principal. We agree with the District Court's instruction on this phase of the case.[5] But subsequent to its charge on the point, the court in instruction 18, outlined both the government's *and* GM's contentions with respect to the responsibility of a corporation for the knowledge of its agents without placing its approval on either contention. We are of the opinion that as a result of instruction 18 a substantial danger arose that the jury would be left in doubt as to the applicable legal principle. Since this instruction came towards the close of the charge it is not unlikely that the proper instruction formerly given would lose much if not all of its force.

Finally, the government objects to the following part of the charge:

"Even if the jury should believe from the evidence the representatives of defendant who dealt with the Railroad Company knew or had reason to believe the Railroad Company was paying substantially more for the property which it contracted to sell to defendant than the selling price to defendant, your verdict should nevertheless be for defendant unless the jury should also believe from the evidence that the sale to defendant at a lower price *constituted a device to give to defendant a consideration as a rebate and offset against the Railroad Company's regular charges for transportation.*" (Emphasis supplied.)

---

**5.** The relevant part of the charge reads: "In determining whether or not the Corporation has violated the Elkins Act, the Corporation is held responsible for all the acts of its officers and agents in the course of their employment. By course of employment is meant the acts of the officers and agents are directed towards the business and ends of the Corporation. It does not matter that the specific acts involved were not expressly authorized by the Corporation, nor is it material the Corporation by general policy or otherwise may have expressly instructed the officers and agents not to perform the specific acts which were in fact done if such acts were in fact in the course of employment." See New York Central and Hudson River Railroad Co. v. U. S., 1909, 212 U.S. 481, 493–495, 29 S.Ct. 304, 53 L.Ed. 613; Egan v. United States, 8 Cir., 1943, 137 F.2d 369, 379.

We think the italicized language was susceptible of the interpretation that a specific intent to violate the statute was required. Insofar as it carried this meaning the instruction was not in accordance with the law.

"Besides, all the contentions just noticed proceed upon the mistaken legal conception that the application of the statutory prohibitions depend not upon whether the effect of the acts done is to violate those prohibitions, but upon whether the carrier intended to violate the statute." New York, New Haven & Hartford Railroad Company v. Interstate Commerce Commission, 1906, 200 U.S. 361, 398, 26 S.Ct. 272, 280, 50 L.Ed. 515. And see Armour Packing Co. v. United States, 1908, 209 U.S. 56, 85.

In conclusion it may be noted that GM contends the government is precluded from assigning error with respect to the charge of the court because of its failure to comply with Fed.Rules Civ. Proc. rule 51, 28 U.S.C.A.[6] Accordingly it is urged that we summarily affirm the District Court's judgment. GM's contention is grounded apparently on the fact that the government did not make the requisite objections after the charge and before the jury retired. From a reading of the record, however, it is clear that there was compliance with Rule 51. The District Court was fully apprised of the government's requested instructions and of its objections to those proffered by the defendant. That it did not reiterate its position subsequent to the charge of the court is not a fatal omission. We agree with the following statement in Williams v. Powers, 6 Cir., 1943, 135 F.2d 153, 156:

"Rule 51 should be read in conjunction with Rule 46. The purpose of these rules is to inform the trial judge of possible errors, that he may have an opportunity to consider his rulings and if necessary to correct them, and where it appears in the record that the point urged on appeal was called to the attention of the trial court in such manner as to clearly advise it as to the question of law involved, that is sufficient."

And see Montgomery v. Virginia Stage Lines, 1951, 89 U.S.App.D.C. 213, 191 F. 2d 770. GM relies on two cases by this court, United States v. 425,031 Square Feet of Land, etc., 3 Cir., 1951, 187 F.2d 798 and Trowbridge v. Abrasive Co. of Philadelphia, 3 Cir., 1951, 190 F.2d 825. It does not appear in these cases, however, that the trial court was given an adequate opportunity to consider the objection raised on appeal. "The exception taken on this point was hardly designed to bring into focus the precise nature of the alleged error", Trowbridge v. Abrasive Co., supra, at page 830.

For the reasons stated the judgment of the District Court will be reversed and the cause remanded with directions to proceed in accordance with this opinion.

---

6. "No party may assign as error the giving or the failure to give an instruction unless he objects thereto before the jury retires to consider the verdict, stating distinctly the matter to which he objects and the grounds of his objection."