**UNITED STATES of America,**
**Plaintiff,**

**v.**

**MICHAEL SCHIAVONE & SONS, INC.,**
**Defendant.**
**Civ. A. No. 62–515.**

United States District Court
D. Massachusetts.

June 30, 1969.

As Amended Aug. 22, 1969.

Appeal Dismissed Jan. 12, 1970.

See 90 S.Ct. 565.

Herbert F. Travers, Jr., U. S. Atty., David M. Roseman, Asst. U. S. Atty., for plaintiff.

Joseph S. Oteri, Harvey A. Silverglate, Boston, Mass., for defendant.

## MEMORANDUM AND ORDER

FRANK J. MURRAY, District Judge.

This is an action brought July 18, 1962 by the United States (plaintiff) pursuant to Title 49, Section 41(3), of the United States Code, a section of the Elkins Act, to recover treble damages against defendant for knowingly receiving and accepting from the Boston & Maine Railroad (Railroad) a rebate or concessionary offset against the regular charges for transportation of defendant's freight in interstate commerce. The action was tried without jury. Written and oral stipulations were entered into by the parties and became part of the evidence before the court. The parties also offered testimony of witnesses. This memorandum contains the findings and conclusions of the court. See Fed.R.Civ.P. 52(a). The transaction attacked is the sale of about 957,734 square feet (approximately 21.5 acres) of land and structures, including tracks, situated at Mystic Wharf, Charlestown, Massachusetts ("Mystic Wharf property"), by Railroad to defendant for $0.50 per square foot of land, the sum total being $478,867.00.

Plaintiff contends the price for the land with improvements given by defendant was inadequate, that the fair value of the property sold was $950,000.00 (approximately $1.00 per square foot of land), and that the sale resulted in a concessionary offset by Railroad to defendant of $471,133.00 to the charges for interstate rail transportation of defendant's freight over the lines of Railroad. Defendant denies that the consideration for the sale was only $478,867.00, and asserts it was substantially in excess thereof and represented fair value for the conveyance. Defendant further asserts that the Government has failed to show by any evidence that defendant knowingly solicited or accepted a rebate or concessionary offset to transportation charges.

### A. *The Conveyance, 1957 Lease, and 1960 Option*

On December 30, 1960 defendant, through a subsidiary, received conveyance from Railroad of the land and structures referred to for $478,867.00, pursuant to a written option given de-

fendant by Railroad specifying a purchase price of $0.50 per square foot. One half, $239,433.50, was paid in cash, and the balance by a note payable in ten years, in ten equal annual installments, with interest payable semi-annually at the rate of 5⅜% annually. The note was prepaid by defendant in December 1961. When the conveyance was made, defendant was lessee of substantially the same premises (the differences are hereinafter described) under a lease (1957 lease) with Railroad and The Mystic Terminal Company (Terminal) as lessors.[1] The lease was executed January 7, 1957. While the lease was in force and effect, Railroad, on February 23, 1960, gave defendant the option (1960 option) referred to above, which defendant exercised.

When it was made, the lease covered approximately 19.5 acres (about 850,000 square feet) of the Mystic Wharf property, and was subject to certain easements reserved to Railroad. The term was for ten years from May 1, 1957, and lessee was given an option to renew for two successive ten-year terms. Lessee (defendant) covenanted to maintain the premises in good condition, and

pay all charges for water, electricity and other utilities. Lessee also covenanted to

(1) pay all real estate taxes;

(2) pay all premiums for insurance against loss by fire and windstorm;

(3) expend $300,000.00 for improvements to the dock and premises (exclusive of buildings, foundations for buildings and machinery) within three years after May 1, 1957, at least $25,000.00 thereof within the first year;[2]

(4) generate 135,000 tons of road haul traffic to Railroad during the first three years, at the rate of 25,000 tons the first year, 50,000 tons the second year, 60,000 tons the third year, and at least 75,000 tons each year thereafter.[3]

In the lease the lessee was given an option to purchase the leased premises after May 1, 1960 and before end of the initial term at a price of $1.00 per square foot of land, with the right to exercise the option if lessee was not then in default of any obligations under the lease. The right to purchase was subject to the proviso that if lessee, upon a resale,

---

1. Terminal was a nominal party to the lease. All transactions involving the Mystic Wharf property material to this litigation were, in substance, between Railroad and defendant, and are so treated in this memorandum.

2. Section 5 of the lease provided that "[t]he rental payable by the Lessee to the Railroad and Terminal for the initial term hereof shall be deemed to be the $300,000.00 to be expended as aforesaid". Rent for any additional terms "shall be agreed upon between the parties hereto".

3. It is provided in the lease (section 15) that if the Lessee fails to "handle and/or generate a total of at least 135,000 tons of road haul rail traffic in the first three years from May 1, 1957, or in the event that in each year thereafter during the original term and any extension thereof the lessee, its subsidiaries and controlled affiliates, fail to handle and/or generate a total of at least 75,000 tons of road haul traffic, then the Lessee shall be considered in default and the Railroad shall have the right to termi-

nate this lease in accordance with the provisions hereinafter set forth in the event of a default".

Section 15 further provides: "Anything in this section (15) to the contrary notwithstanding, the obligations under this section shall be suspended in the event that the Lessee shall be prevented or limited in the performance of any of the terms and conditions or its obligations under this lease by any subsequently enacted government restrictions or regulations, or any war, state of hostilities, insurrection, riots, strikes, disaster, or any cause beyond its control, except business or economic conditions, whether similar to or dissimilar to the foregoing. The duration of the said suspension shall be for the period of the existence of such cause or causes and upon the cessation of such cause or causes the said obligation shall be reinstated and the Lessee shall have the right to perform or comply during a subsequent period of the same duration as the period of such suspension."

"does not sell to a person * *, * who will simultaneously with such conveyance give the Railroad an undertaking to handle and/or generate equal tonnages * * * [as hereinabove set out in (4)] on substantially similar terms and conditions, then the Railroad shall be entitled to receive from the Lessee as such reseller one half of the net profits, within 6 days of the resale of the demised premises as they exist at the time of said resale, but excluding therefrom the value of buildings thereon". Three amendments to the lease related to the quantum of the leased premises. Total land area under the lease, as amended, approximated 23.4 acres.

Defendant carried on the scrap metal business at the leased premises until they were conveyed. As lessee, defendant paid $215,479.94 in real estate taxes for the years 1957, 1958 and 1959. Insurance premiums in the amount of $12,-200.00 were paid up to December 30, 1960. Defendant expended $304,808.02 on the leased premises in fulfillment of its obligation to expend $300,000.00. The road haul traffic generated is shown in the following tabulation:

| | |
|---|---|
| May 1, 1957 to April 30, 1958 | 22,445 gross tons |
| May 1, 1958 to April 30, 1959 | 63,399 gross tons |
| May 1, 1959 to February 29, 1960 | 51,869 gross tons |
| | 137,713 gross tons |

The freight charges paid by defendant to Railroad for the tonnage shown were $570,605.00, and during three years ending December 30, 1960 were $716,645.00. Defendant had fulfilled all of its obligations under the lease when the conveyance was made in December 1960.

Railroad granted to defendant in a written document made February 23, 1960 an exclusive 60-day option to purchase approximatly 21.5 acres of the Mystic Wharf property for $0.50 per square foot. It contained no reference to generating road haul tonnage. It provided for the automatic termination of the 1957 lease in the event of conveyance to defendant of the premises covered by the option. It required defendant to execute and deliver to Railroad a covenant, as part consideration of the conveyance, giving Railroad "the right of first refusal or option to purchase" the whole or any part of the conveyed premises which might thereafter become the subject of a contemplated sale by defendant. On April 15, 1960 defendant seasonably exercised its rights under the option. When the conveyance was made December 30, 1960, the defendant by letter of December 28, 1960 executed and delivered the agreement of "first refusal".

### B. *The Negotiations of the Parties*

The negotiations which preceded the transactions between the parties commenced in 1956 when Joseph Schiavone, defendant's principal negotiator, and Patrick McGinnis, president of Railroad, discussed the possibility of using railroad land for the scrap metal business. As appears in Exhibit No. 2, which the court rules admissible to show the negotiations between the parties, Railroad proposed to sell the Mystic Wharf property for $1.50 per square foot of land to defendant, provided defendant would expend $1,500,000.00 for equipment and improvements to the property and would furnish 200,000 tons of road haul freight per year, and, provided further, that in the event defendant failed to furnish the specified tonnage Railroad reserved the right to repurchase the property at $1.50 per square foot or, alternatively, to charge defendant $3.75 per ton for every ton of freight less than the specified minimum of 200,000 tons. This proposal was not accepted.

Approximately two months later, representatives of defendant and Railroad met to settle upon the terms of a lease of the property, which culminated in an agreement on the terms later included in the 1957 lease. During the discussions at the meeting, Eugene J. Ratto, counsel for Railroad, offered the views that the parties to the lease had to be concerned with the Elkins Act, that it was his understanding that Railroad could not, because of the Elkins Act, give rebates for tariffs on traffic, that the traffic itself could not be the consideration for the lease of the premises, and that consideration given defendant by any other transaction between the parties which effected a reduction in the tariff rates would be an impermissible rebate. These views were accepted by both parties at the meeting. The 1957 lease was drawn by Mr. Ratto. It was his belief that the traffic clause in the lease was not part of the consideration for renting the premises, and further his belief, on the basis of discussions with his clients and being advised what they thought was the rentable value of the property, that there was not any danger of Elkins Act violations.

While the 1957 lease was in effect, defendant requested modification of the lease by deleting the traffic clause and by an amendment to enable defendant on its own behalf to pursue remedies for tax abatement or adjustment. Defendant argued that the traffic clause in the lease prevented it from securing adequate financing for improvements to the property, and that if such improvements were made the traffic tonnage would be substantially increased to the benefit of the Railroad. Defendant took the position that obtaining financing was difficult because breach of the traffic clause was a default under the terms of the lease, and thus there was a danger that failure to meet traffic requirements would shorten the term of the lease to the detriment of any security interest held by a lender. Negotiations were carried on for several months following defendant's request for modification. In October 1959 defendant proposed it be given an option to purchase the property. The negotiations finally culminated in the grant to defendant of the 1960 option.

## C. *Discussion*

When Railroad and defendant commenced negotiations in 1956 for the Mystic Wharf property, the dock, buildings and land surface were in poor physical condition generally. Except for certain small areas of the tract the property was not then in use and had not been used for several years. There was no evidence offered to the court of the fair rental value in dollars of the premises. Whether the parties had any advice as to the dollar rental value when they negotiated for the lease, or discussed rental value between themselves, was not shown by the evidence, but it is apparent that the terms of the lease took into account the need for improving the overall physical condition of the dock and surface area, and the long-term prospects for business or industrial use of the water, rail and highway transportation advantages which the Mystic Wharf property offered. There is nothing to show, however, that the net rental reserved to Railroad under section 5 of the lease (see note 2 *supra* and accompanying text), even if allocated at the rate of $30,000.00 per year net for the initial term of ten years, was so grossly inadequate as to require the conclusion that it was less than fair rental value and, as argued by the Government, that it might be regarded as effectuating a concession or rebate in a deal between Railroad and defendant to accomplish that purpose. Moreover, defendant's cost of occupying the leased premises included not only the obligated expenditure of $300,000.00 in three years, but in addition all taxes assessed, all betterment assessments should they be made, and all expense for maintaining the premises and keeping them insured. These obligations assumed by defendant lifted burdens from Railroad's shoulders. Obviously, they cannot be viewed as concessions to defendant. Expenditures for improving

the overall physical condition of the dock and land surface were needed if the property was to be developed to its best use. Unlike the agreement referred to in United States v. Boston & Maine R.R., 157 F.Supp. 218 (D.Mass.1957), the Railroad here did not assume any direct financial obligations for improvement of the property, and, while it could be argued that Railroad allocated the entire rental reserved for the ten-year term to improving the leasehold, defendant derived no advantage from such allocation other than use of improved facilities. There is nothing to show that defendant's obligations as lessee, when undertaken in 1957, were in any manner related to the 1960 option or the purchase of the property in December 1960.

■ The traffic clause was, of course, of benefit to Railroad as it looked ahead to substantial freight business from defendant. Before inserting such a clause in the lease, however, both parties were cautioned that they should be concerned about it. "Obviously there are many limits to what a railroad can do in the way of promotion. Its expenditures can not be too remote, cf. Davis v. Old Colony R. Co., 131 Mass. 258 [1881]; neither can they be too direct, viz., rebates or discrimination". United States v. Boston & Maine R.R., *supra*, at 220. The presence of the traffic clause alone, however, does not prove the existence of a rebate or discriminatory conduct. Here it has not been proved that from the terms of the lease, the circumstances which attended the making of it, and the performance of the parties under it, or the subsequent sale of the property to the defendant, that the lease was a scheme or deal to confer an illegal benefit or advantage on defendant as a shipper of freight.

In considering plaintiff's contention that the sale to defendant on December 30, 1960 for $478,867.00 constituted a device whereby a concessionary offset or rebate was given defendant in violation of 49 U.S.C. § 41(3), these facts clearly appear. Both parties knew the premises conveyed were in better physical condi-

tion than when defendant, as lessee, undertook to improve them. Moreover, both were aware of the actual figures of road haul traffic and the revenues therefrom, and were sufficiently familiar with prediction factors which could be applied to such figures so as to provide them with reliable estimates of future freight volume and revenues. There is nothing to show that defendant's business was falling off or that its road haul traffic was likely to decrease, nor did defendant offer any reliable evidence tending to show that the value of the Mystic Wharf property, in use or in the market, was less than when the 1957 lease was made. Railroad made no efforts to become informed of the fair market value of the property before granting the 1960 option, nor did it make inquiry whether other shippers were interested in acquiring the property. At least such inquiry might have informed Railroad whether there was a demand for the property in the open market. Nor did defendant seek advice as to market value before soliciting the option to buy at fifty cents per square foot. Both parties were fully aware of the $1.00 per square foot option granted in the 1957 lease, and there is nothing to show that Railroad or defendant received either advice or actual market data concerning other parcels which to a non-expert in the field of real estate valuation might be thought persuasive of the market value of the Mystic Wharf property before the 1960 option was granted. Furthermore, there is no evidence that either party sought legal advice concerning the Elkins Act application, if any, to the option solicited by defendant, notwithstanding that each understood and heeded the advice given by railroad counsel Ratto before the 1957 lease was executed.

■ The men representing Railroad and defendant in the negotiations for the Mystic Wharf property were experienced businessmen, and the 1960 option was not their first venture in real estate transactions. However, the evidence fails to show that any of them possessed

expert or even ordinary qualifications as to valuation of real estate. None of them testified on the issue of valuation. Surely they were aware of the practice of securing appraisals from real estate experts when the question of value is at issue and is important. Furthermore, they must have possessed the most rudimentary knowledge of real estate valuation which teaches that fair cash value "as applied to land ordinarily must be ascertained by methods different from those applied to cotton, coal or active stocks, which are dealt with daily in the public market and which therefore have an easily determined cash value". Massachusetts General Hospital v. Inhabitants of Belmont, 233 Mass. 190, 208, 124 N.E. 21, 28 (1919). They had been cautioned earlier that a real estate transaction between Railroad, as a carrier, and defendant, as a shipper of freight, entailed risks of Elkins Act violations. It is not likely they had forgotten this advice, and it is clear to the court beyond reasonable doubt that both parties were willing to, and did in fact knowingly, assume the risk that the defendant would be receiving the Mystic Wharf property for substantially less than its fair value when the sale was made in December 1960. They were concerned only with the view that the transaction, in which one of the objects was road haul traffic, was a desirable one to both parties, and they consummated it despite the risk of illegal action which they knew they were taking. Although it is not shown that there was a scheme to violate the Elkins Act, yet, if defendant knowingly derived a discriminatory concession, the transaction must, nevertheless, be adjudged illegal. "Offering or soliciting the concessions explicitly violates the * * * [Elkins Act] * *. The concessions are none the less illegal, if made for non-transportation services, as long as they result in lowering directly or indirectly transportation costs to a shipper. That other inducements may also have influenced the concessions is not important when a materially effective purpose is the securing of traffic for an interstate carrier. Where traffic is an object and discriminatory advantage the means employed in attempting to obtain or actually obtaining it, there is a violation of the * * * [Act] in respect to transportation". Union Pacific R. R. v. United States, 313 U.S. 450, 464, 61 S.Ct. 1064, 1072, 85 L.Ed. 1453 (1941). There remains only the determination whether the sale was for less than fair value.

Both parties offered the opinions of qualified witnesses on the issue of fair market value, and there was also evidence of the selling prices of other parcels on the Boston water front. The expert witnesses offered their views as to the comparability or lack of it of these and other parcels mentioned by them. The Government's witnesses were in substantial agreement that the fair market value at the time of the sale was approximately $1.00 per square foot. Each rested his opinion mainly on comparisons made between the relevant characteristics of the Mystic Wharf property and similar characteristics of other parcels which had been sold. Defendant's expert gave his opinion that the Mystic Wharf property had a fair market value of $351,000.00, or approximately 36.6 cents per square foot, if sold encumbered by the 1957 lease. When asked his opinion of the value unencumbered by the lease, he replied: "Fifty cents a foot, approximately $500,000". It was not shown how much study he gave to the problem of value of the property considered unencumbered by the lease or what weight, if any, he accorded to sales of other parcels. It was his opinion that sales of other property shed no light on the value of the locus considered encumbered by the lease. He viewed the parcel as "unmarketable to another user or buyer purchasing for a return, until * * * six years and four months [of the lease] had expired" (Tr. 4–43), and it was his opinion "that any willing buyer, and this would be with the exception of Mr. Schiavone of the Schiavone Realty, evaluating what he would receive on the date in question,

December 30, 1960, would be buying the property subject [to] the lease" (Tr. 4–41–42). If defendant's leasehold had a market value at that time, and presumably it did, defendant's expert never gave his opinion of it. The court was not enlightened by the expert testimony of defendant's witness and finds that testimony unpersuasive as to the value of the property unencumbered by the 1957 lease.

Defendant obviously had a strong bargaining position when the 1960 option was obtained from Railroad. There is no vice in striking a good bargain, and appropriate weight must be given to this factor in evaluating the expert testimony. It is apparent, however, that the major issue present here is whether the Mystic Wharf property should be valued as encumbered by the 1957 lease.

If defendant is to be treated simply as a hypothetical willing shipper-purchaser in the market for this property, as defendant was treated by his expert, it is clear that the more than six years remaining as the unexpired term of the 1957 lease, a period of rent-free occupancy for the net lease tenant, would sharply reduce what defendant would be willing to pay for the property. It may even be assumed that the fair value of the property as encumbered by the lease to a hypothetical willing shipper-purchaser would not exceed $0.50 per square foot, the price paid by defendant.

The 1957 lease, however, was an encumbrance created by the parties to the 1960 sale. There is warrant in neither law nor logic to treat defendant merely as a hypothetical stranger to the property. Defendant's expert at least implicitly recognized that defendant would derive greater value from the purchase of the property than would a hypothetical shipper-buyer, and at least one court has approved a compulsory purchase measure of compensation which would permit an award in excess of what a hy-

pothetical buyer would pay where the taker acquired a fee interest in property it occupied under a long-term lease. *See* Lambe v. Secretary of State for War, [1955] 2 Q.B. 612 (C.A.).

■ In plain fact, the market for the property as encumbered by the lease between Railroad and defendant was distinct from the market for the property between Railroad and any other shipper-purchaser. Defendant was already established on the property, was conducting a going business, and desired to be free from the effect of the lease's traffic clause as well as to acquire the right to independently challenge tax assessments. When the property was sold to defendant, the value transferred (*cf.* Kimball Laundry Co. v. United States, 338 U.S. 1, 5, 69 S.Ct. 1434, 1437, 93 L.Ed. 1765 (1949)) by Railroad to defendant was greater than the value Railroad could transfer to. any other shipper-purchaser. Implicitly or explicitly, courts and administrative agencies have long recognized the principle that the value of property to a particular condemnor or purchaser may greatly exceed the value of that property to all other hypothetical purchasers.[4] While the decisions cited in the Appendix to note 4 may or may not reflect sound eminent domain or compulsory purchase law,[5] the separate market principle they establish is apposite here because the court is dealing only with value to a private party. *See* Market Street Ry. v. Railroad Commission, 324 U.S. 548, 567, 65 S.Ct. 770, 779, 89 L.Ed. 1171 (1945). The court holds that the value of the property to defendant was not depressed by the outstanding 1957 lease.

■■ Finally, there is no merit to the belated and ingeniously constructed argument that the consideration given by defendant was in excess of $478,-867.00, and represented fair value, because to the consideration given should

---

4. See cases cited in Appendix.

5. *Compare* Boston Chamber of Commerce v. City of Boston, 217 U.S. 189, 195, 30

S.Ct. 459, 460, 54 L.Ed. 725 (1910) ("[T]he question is [w]hat has the owner lost? not, [w]hat has the taker gained?").

be added amounts related to defendant's expenditures under the lease for improvements, and pre-payment of the mortgage note. I find that the fair value of the property sold to the defendant on December 30, 1960 was, on that day, not less than $700,000.00; and that defendant knowingly received from Railroad, as a rebate or concessionary offset against traffic charges, valuable consideration from the sale in the amount of $221,123.00. The United States is entitled to recover $663,399.00 as treble damages from the defendant.

Order accordingly.

### APPENDIX TO FOOTNOTE 4

See In re Port Auth. Trans-Hudson Corp., 48 Misc.2d 485, 265 N.Y.S.2d 925 (Sup.Ct.1965), 50 Misc.2d 613, 271 N.Y.S.2d 95 (Sup.Ct.), 52 Misc.2d 943, 277 N.Y.S.2d 999 (Sup.Ct.), *modified*, 27 App.Div.2d 32, 276 N.Y.S.2d 283 (1966), *modified*, 20 N.Y.2d 457, 285 N.Y.S.2d 24, 231 N.E.2d 734 (1967), *cert. denied sub nom.* Port Auth. Trans-Hudson Corp. v. Hudson Rapid Tubes Corp., 390 U.S. 1002, 88 S.Ct. 1244, 20 L.Ed.2d 103 motion for leave to file bill of complaint denied *sub nom.* New Jersey v. New York, 390 U.S. 1000, 88 S.Ct. 1243, 20 L.Ed.2d 102 (1968) (condemnation of unprofitable subway); Appleton Water Works Co. v. Railroad Comm'n, 154 Wis. 121, 142 N.W. 476, 47 L.R.A. N.S. 770 (1913) (acquisition of unprofitable waterworks); In re City of Oroville, [1922E] P.U.R. 451, 467–72 (Cal.R.R. Comm'n) (acquisition of unprofitable gas system); In re City of Washburn, [1924D] P.U.R. 368 (Wis.R.R. Comm'n) (acquisition of unprofitable waterworks); International Ry. v. Niagara Parks Comm'n, [1937] 3 D.L.R. 305 (P.C.), *rev'g* [1936] 1 D.L.R. 737 (Ont. Ct.App.1935) (acquisition of unprofitable trolley line); In re Ottawa & Gloucester Road Co., 69 D.L.R. 486, 487 (Ont.Sup.Ct.), *appeals dismissed*, 69 D.L.R. 486, 493 (Ont.Sup.Ct., App.Div. 1921) (acquisition of unprofitable private toll roads). *See also* Raja Vyricherla Narayana Gajapatiraju and The Revenue Divisional Officer, Vizagapatam, [1939]

A.C. 302, 312 (P.C. India) (acquisition of unused spring):

> The compensation must be determined * * * by reference to the price which a willing vendor might reasonably expect to obtain from a willing purchaser. The disinclination of the vendor to part with his land and the urgent necessity of the purchaser to buy must alike be disregarded. Neither must be considered as acting under compulsion. This is implied in the common saying that the value of the land is not to be estimated at its value to the purchaser. But this does not mean that the fact that some particular purchaser might desire the land more than others is to be disregarded. The wish of a particular purchaser, though not his compulsion, may always be taken into consideration for what it is worth.

*See generally* Comment, Valuing an Unprofitable Business Taken for Continuing Public Use, 68 Colum.L.Rev. 977 (1968).