UNITED STATES of America,
Plaintiff, Appellee,

v.

MICHAEL SCHIAVONE & SONS, INC.,
Defendant, Appellant.

No. 7510.

United States Court of Appeals,
First Circuit.

Heard May 5, 1970.
Decided July 29, 1970.

Harvey A. Silverglate and Kevin M. Keating, Boston, Mass., with whom Flym, Zalkind & Silverglate, Joseph S. Oteri, and Crane, Inker & Oteri, Boston, Mass., were on brief, for defendant, appellant.

Leonard Schaitman, Atty. Dept. of Justice, with whom William D. Ruckelshaus, Asst. Atty. Gen., Herbert F. Travers, Jr., U. S. Atty., and Morton Hollander, Atty., Dept. of Justice, were on brief, for plaintiff, appellee.

Before ALDRICH, Chief Judge, McENTEE and COFFIN, Circuit Judges.

COFFIN, Circuit Judge.

This is an appeal from a treble damage judgment against Michael Schiavone & Sons, Inc., the district court having found that Schiavone knowingly received an illegal rebate from the Boston & Maine Railroad, in violation of the Elkins Act, 49 U.S.C. § 41(3), when it purchased certain property from the Railroad for less than the fair market value. United States v. Michael Schiavone & Sons, Inc., 304 F.Supp. 773 (D.Mass. 1969), appeal dismissed, 396 U.S. 275, 90 S.Ct. 565, 24 L.Ed.2d 466 (1970).

On May 1, 1957, Schiavone, a dealer in scrap metal, and the Railroad entered a ten-year lease of the Railroad's Mystic Wharf property in Charlestown, Massachusetts. The rent was set forth as Schiavone's obligation to spend at least $300,000 for improvements to the dock and premises within the first three years of the lease. In addition, Schiavone agreed to pay all real estate taxes, insurance premiums, and utility charges, and to generate 135,000 tons of road haul freight traffic for the Railroad in the first three years and 75,000 tons each year thereafter. The lease contained an option to purchase the property for $1.00 per square foot, exercisable from the beginning of the fourth year through the tenth year of the lease.

In late February 1960, after Schiavone had experienced difficulty in obtaining long term financing because of the annual tonnage requirements, the Railroad granted Schiavone a 60-day option for purchase of the 21.5 acres covered by the lease for 50 cents a square foot. The option was exercised on April 15 and the land conveyed in December 1960, Schiavone paying the total purchase price of $479,000 by the end of the following year. Soon thereafter, the United States brought suit against Schiavone under the Elkins Act, contending that Schiavone had knowingly received a rebate against freight rates when it purchased the property from the Railroad for less than the fair market value.

Expert witnesses for the government testified at trial that the property was probably unmarketable with the lease encumbrance—since the lease produced no income to the owner for the remaining six and a half years of the lease—but that without such encumbrance, the property was worth $1.00 a square foot, or $950,000. Schiavone's expert witness placed the value of the property at roughly $350,000 with the lease encumbrance, and at roughly $480,000 without it. The district court concluded that the lease itself was not contrary to the Elkins Act but that the property should be viewed *without* the lease encumbrance, since Schiavone's purchase of the property eliminated the lease as an encumbrance on it as far as Schiavone was concerned. The court then held that the fair market value of the property without the encumbrance was at least $700,000 and that Schiavone had received a rebate of some $221,000 [$700,000 market value less $479,000 purchase price], which amount was trebled in accordance with the Elkins Act and assessed against Schiavone.

Schiavone's first contention on appeal is that the government is estopped from bringing this suit, because

the Interstate Commerce Commission had suspicions about the legality of the 1957 lease as early as 1957, knew about the 1960 purchase option within a month after it was exercised, and yet neither advised Schiavone that the lease or sale was improper nor sought to enjoin the December 1960 conveyance of the property. Schiavone concludes that such government inaction "is tantamount to a determination in advance given to this defendant that what he is about to do is lawful." However, the governmental acquiescence for three years concerning the 1957 lease does not constitute acquiescence in the 1960 sale—the only transaction found violative of the Elkins Act —at *half* the price set forth in the 1957 lease. Moreover, it was not until after the consummation of the 1960 sale that the government obtained its appraisal, which indicated to it that the purchase price was far below the fair market value.

Even if there had been some evidence of governmental acquiescence in the 1960 sale, that would not bar the government from bringing this suit, for it is not true that once a government agency smells a rat, the agency must exterminate it forthwith or allow it the run of the public's house in perpetuo. *See, e.g.,* United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 225–226, 60 S. Ct. 811, 84 L.Ed. 1129 (1940); Utah Power & Light Co. v. United States, 243 U.S. 389, 409, 37 S.Ct. 387, 61 L.Ed. 791 (1917); United States v. New Orleans Chapter, Associated General Contractors, 382 U.S. 17, 86 S.Ct. 33, 15 L.Ed.2d 5 (1965), reversing 238 F.Supp. 273 (E.D. La. 1964). Absent specific affirmative governmental approval of the 1960 sale —of which there was none asked or given here—the government is not estopped from bringing this action under the Elkins Act.

Schiavone launches a similarly insubstantial argument that the district court erred in finding that it "knowingly" received a rebate. The Elkins Act had been discussed during the negotiation for the 1957 lease. Officials of both Schiavone and the Railroad had had subsequent discussions with I.C.C. investigators. Both the Railroad and Schiavone were sophisticated in business real estate transactions and fully aware of the Elkins Act requirements. Yet when they agreed in 1960 on an option to purchase at 50 cents a square foot, knowing that the option in the existing lease called for a price twice that amount, they acted without seeking the advice or approval of the I.C.C. and without a visible trace of concern as to what the fair market value was. Whether the test be phrased in terms of being "wholly indifferent" to the prohibitions of the statute, New York, New Haven and Hartford R.R. v. Interstate Commerce Commission, 200 U.S. 361, 396, 397, 26 S.Ct. 272, 50 L.Ed. 515 (1906), or "consciously indifferent", United States v. Boston & Maine Railroad, 157 F.Supp. 218, 220 (D.Mass. 1957), or of having a "conscious purpose to avoid enlightenment", United States v. General Motors Corp., 226 F.2d 745, 749 (3d Cir. 1955), the district court did not err in finding that it had been met in this case.

This brings us to the crux of the problem presented by this appeal: whether Schiavone obtained an illegal rebate against freight rates when it purchased the property for $479,000 in December 1960. It is clear that if Schiavone purchased the property from the Railroad for an amount less than what other shippers would have had to pay for the same property on the open market, then Schiavone did receive an illegal rebate. We therefore have two questions to decide: what would other shippers have paid for this property? and what did Schiavone pay? As our discussion below indicates, neither question is as simple as it first appears.

In trying to determine what other shippers would have paid for this property, we are confronted by the fact that no other shippers could have purchased from the Railroad the same unencumbered fee which Schiavone obtained when it purchased the property, since

Schiavone's purchase automatically extinguished the lease encumbrance which ran against all other purchasers and which greatly depressed the property's value to such purchasers. Schiavone therefore contends that since the other shippers could only purchase the property as encumbered by the lease, that is the way the property must be viewed for purposes of our first inquiry.

If the law were as Schiavone suggests, a shipper could negotiate a lease which would make the fee as encumbered valueless or unmarketable for a period of years and then purchase the property for a small amount, thereby extinguishing the encumbering lease. The result would be that such shipper would have obtained valuable land for a pittance. It is not a sufficient answer to say that plotting such a two-step scheme would be proscribed by the Elkins Act. Not only would proof of such planning be difficult to obtain, but such leases might be made in complete good faith, with subsequent pressures and temptations of both railroad and shipper causing them to engage in a concessionary purchase transaction, behind the shield of the prior lease. Such acquisition of valuable property from a railroad for less than its fair market value would give the lessee-purchaser a substantial advantage over other shippers.

Moreover, since Schiavone's purchase of the encumbered property automatically extinguishes the encumbrance, Schiavone is immediately in a position to resell the property *without* the encumbrance. If the property in this case had a value of $350,000 with the lease encumbrance (as Schiavone's expert suggests) and the Elkins Act allowed Schiavone to purchase at that price (as Schiavone insists), Schiavone could buy at $350,000 and immediately resell for $700,000, the amount found by the court as the fair market value of the property without the encumbrance. The result is that Schiavone turns a substantial profit

for itself directly attributable to the Railroad's sale of the property at its value as encumbered.

▇ Only by requiring the lessee-shipper to pay the fair market value of the property *without* the lease encumbrance can we be certain that the aforementioned advantages do not accrue to the lessee-shipper. We therefore hold that the district court was correct is ignoring the 1957 lease encumbrance for purposes of this first inquiry and in setting $700,000 as the fair market value of the property.

Having concluded that Schiavone was required by the Elkins Act to pay at least $700,000 for the property, we consider our second question: how much did Schiavone in fact pay? The district court treated Schiavone's payment of the $479,000 purchase price as the only relevant expenditure, finding no merit in Schiavone's argument that the prepaid portion of its $300,000 rental payments for capital improvements should be added to the purchase price.[1] Without question, the argument is a difficult one to comprehend, for one is inclined to view the 1957 lease and the 1960 sale as distinct and separable transactions. Indeed, since the parties did not specify that some portion of the prepaid rent was to be added to the $479,000 payment in order to arrive at the actual purchase price, the normal view would be that any prepaid portion was—as far as these parties were concerned—simply washed out by the subsequent sale.

However, since our aim under the Elkins Act is to prevent Schiavone from obtaining a rate concession, our concern is not with the conceptual separateness of the lease and sale, or with the rights and liabilities existing between the parties, but with what it cost Schiavone to acquire the property. As we discuss below, we think that a portion of Schiavone's payments under the lease do represent a very real cost of acquiring the

---

1. This case proved rich ore for intricate argumentation; we can well understand how the gold was obscured by the pyrite.

property and that those payments should have been taken into account by the district court in determining the amount of any illegal rebate under the Elkins Act.

The lease specified that, as rent for the ten-year term, Schiavone would expend $300,000 for capital improvements, all in the first three years. Had these payments been made in yearly installments rather than in the first three years, Schiavone's obligation to pay them would obviously have ended at the time of the sale or simply been made a part of the total purchase price. We see no reason to treat Schiavone differently simply because these payments were prepaid rather than paid in installments. Those payments pursuant to the lease which are attributable to the period *after* the December 1960 sale reflect out-of-pocket expenses of Schiavone for which it has received no value, and are therefore in a very real sense a part of Schiavone's cost of purchasing this property and should be treated as such.[2]

Our problem becomes one of determining what payments are attributable to the period after December 1960. Relying on normal accounting principles, we amortize the full cost of the payments under the lease over their specified useful life. Since 76 of the 120 months of the lease were still remaining after the December 1960 sale, that same proportion of the $304,808.02 found by the district court to have been spent for capital improvements is properly charged to the period after the sale and is therefore a

part of Schiavone's cost of purchasing this property. By adding this prepaid but unused portion to Schiavone's payment of the purchase price, we believe we come as close as possible to ascertaining the total cost to Schiavone of purchasing this property in December 1960. On remand, the district court should ascertain that total cost before recomputing the amount of the illegal rebate under the Elkins Act.

Lest our discussion above be misunderstood by courts and businessmen confronted with this problem in the future, we stress three points. First, our discussion above applies only to cases involving leases held valid under the Elkins Act, as this one was. Were the lease itself to confer a concession on the lessee-shipper, it would probably be inappropriate as a basis for determining, by amortization, the prepaid amounts to be added to any subsequent purchase price. Secondly, assuming a valid lease, we attach no significance to the fact that the $300,000 for capital improvements was designated as the rent; our result would be the same regardless of what the parties designate as rent. Thirdly, we recognize that we have given no weight to the fact that the 1960 sale released Schiavone from a rather onerous freight tonnage obligation to the Railroad, which release may have been of some value to Schiavone. However, since the government has provided no evidence by which we or the district court can assess the value of such release to Schiavone,[3]

---

2. Perhaps the point can be further illustrated by a simple hypothetical. Assume that Schiavone had made the $300,000 improvements in the first month (rather than the first three years) of the lease and then purchased the property. If the fair market value of the property with improvements and without the lease was $700,000, surely no one would contend that Schiavone was required by the Elkins Act to pay $700,000 *more* to purchase the property. Such requirement would mean that Schiavone had expended $1,000,000 within a month's time to obtain property worth only $700,000 which could only be resold by Schiavone for $700,000. We fail to see the rate concession in this

hypothetical so long as Schiavone pays $400,000 more for the property.

3. If the government could have proved that this release had any value to Schiavone, that value would clearly be relevant for determining whether Schiavone received a rebate, and if so, in what amount. Assume the same lease as in this case. After three years, the tenant-shipper comes to the landlord-railroad and offers $50,000 to be released from what has become an onerous lease. Instead of taking the $50,000 which both parties agree the release is worth, the railroad simply grants the release, explicitly or implicitly in return for continued shipments by the

we must treat the release as having no ascertainable value in this case and conclude that all of Schiavone's payments are attributable to the purchase price of the property.

Finally, we add a word in response to our dissenting brother's analysis of this case. We think it goes astray because it focuses on what the Railroad would have received, rather than on what Schiavone paid. This focus is misplaced, we think, because our Elkins Act aim is to assess Schiavone's status vis-a-vis other shippers, not the Railroad's status vis-a-vis Schiavone or other railroads. In other words, the Elkins Act prevents Schiavone from paying less for the property than other shippers would have paid. Since other shippers would have paid $700,000 for the unencumbered fee, that is the amount which Schiavone must pay —any less and Schiavone can resell for a profit. Chief Judge Aldrich's approach set forth in his dissent would allow Schiavone to purchase for about $467,-800 (thus, Schiavone's $479,000 purchase was an overpayment) even though it could immediately resell for $700,000.[4]

As an alternative to its "prepaid rent" claim discussed above, Schiavone advances the argument that it is entitled to "imputed interest" on the purchase price from the date of purchase to May 1967, the original expiration date of the 1957 lease. Although we are not obliged to deal with this alternative claim, we see no merit to it: since the 1960 sale immediately terminated all lease obligations, the original expiration date of the lease is wholly irrelevant. The purchase price was in no sense a prepayment of a

lease obligation, as the argument necessarily suggests.

Schiavone's remaining arguments have been carefully considered and are devoid of merit.

Vacated and remanded to the district court for reassessment of the illegal rebate consistent with this opinion.

ALDRICH, Chief Judge (dissenting).

I agree that Schiavone must pay for the premises unaffected by the lease, and that if he did not pay full value, he received an illegal rebate. However, I cannot agree that he was "required * * to pay at least $700,000 for the property," a figure which included the improvements, or with the corresponding concept that he should be considered to have "paid" other than what the railroad received. In my view, his payment was $479,000, and his obligation was to pay the railroad for what he equitably owned, namely, the *un*improved premises, plus the accrued rent.

If this were an ordinary lease, at an annual dollar rental of, as the court assumes, a fair amount, the fair purchase price at any moment would be the then market value of the property acquired. The rent already accrued would have been paid; the future rent would not have been earned. Although more complicated to compute, I believe the same principle applies here. Accordingly, I disregard Schiavone's obligation to furnish a future annual amount of freight, not because its value was not proved, but because it was irrelevant. The sole question revolves around Schiavone's initial investment of $300,000, which the

tenant. If the government could prove this gratuitous release, clearly there would have been a $50,000 rebate contrary to the Elkins Act.

4. On the assumptions set forth in the dissenting opinion, the value of the unim-

proved property in 1960 was $430,000 ($700,000 improved value less $270,000 for improvements). To this amount the dissent would add about $37,800 (the present discounted value of $60,000 in seven years, at 6% compound interest).

court would call prepaid rent. It was rent, in my opinion, only to the extent that it would increase the value of what was to be received by the lessor. Beyond that it was an expense of the lessee's business, of which he retained the full benefit when he acquired the ownership of the property, and in which the lessor never had any interest.

Let us assume that the improvements originally increased the market value of the unimproved premises by the full $300,000, but that the structure would depreciate, and the market value correspondingly decrease, at the rate of $10,000 a year. The lessor's eventual receipt, on this basis, would be a $200,-000 benefit, due in ten years. This amount is the rent. When the lease was terminated after, let us assume, three years, the net increase in market value was $270,000; in my opinion, an irrelevant figure. The accrued rent that the lessor had earned was three-tenths of $200,000, or $60,000. Even that was not due for another seven years, and must be discounted in return for early payment. I would reach the same result whatever the amount the improvements originally added to the market value of the property. The question is, what would they add to its value when the lessor was due to receive it.

In my view, what the railroad here should receive should be the value of the demised, that is to say, the unimproved, premises, plus the accrued rent thereon, to wit, the earned proportion of the railroad's ultimate additional receipt, appropriately discounted. To the extent that the railroad received less than this, it afforded the shipper-purchaser a rebate. To the extent that the property was salable for more than this, it was because of the improvements in which the railroad had earned no interest. The court's computation culminating in footnote 4 should be no cause for concern. Because of what the improvements had cost him Schiavone's resale would not show a profit.